# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GLENN DRIVER, DEMIKO D.     )
MCCASTER, ROSAMAR MALLARI,   )
JOYCE A. BRITTON, and MICHAEL   )     **Case No. 06 C 6149**
H. HICKS, on behalf of themselves and   )
all other persons similarly situated,    )
known and unknown,             )     **Magistrate Judge Geraldine Soat Brown**
                             )
      **Plaintiffs,**           )
                             )
**v.**                               )
                             )
APPLEILLINOIS, LLC d/b/a       )
APPLEBEE'S NEIGHBORHOOD     )
GRILL & BAR, et al,           )
                             )
      **Defendants.**        )

## MEMORANDUM OPINION AND ORDER

Before the court is plaintiffs' Motion to Exclude the Report of Michael Vucurevich. [Dkt 271.] Defendants AppleIllinois, LLC, W. Curtis Smith, Jerry Kreger, and Doreen Borke as representative of the estate of James Borke and Archie Iodice (collectively, "defendants") have filed their opposition to the motion (Defs.' Resp.) [dkt 275], and plaintiffs have filed their reply (Pls.' Reply) [dkt 276]. For the reasons set forth below, the motion is granted in part and denied in part.

1

## BACKGROUND

### A.      Procedural background

This class action case involves plaintiffs' claims against defendants under the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105/1, *et seq.*, the Illinois Wage Payment and Collection Act ("IWPCA"), 820 Ill. Comp. Stat. 115/1. *et seq.*, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* (Third Am. Compl. ¶ 1.) [Dkt 141.] The named plaintiffs are five individuals who were formerly employed by AppleIllinois as servers and bartenders at an Applebee's restaurant in Ford City, Illinois. (*Id.* ¶ 2-6.) Generally, plaintiffs complain that when they worked for AppleIllinois, they failed to receive statutorily required minimum wages as the result of certain of defendants' practices. The following classes have been certified under Federal Rule of Civil Procedure 23 on plaintiffs' claims under the IMWL: (1) all AppleIllinois tipped employees who were not properly notified of defendants' practice with regard to tip credits; (2) all AppleIllinois tipped employees who were impermissibly paid a sub-minimum tip credit wage rate because AppleIllinois' tip sharing pool was unreasonable; and (3) all AppleIllinois tipped employees who were impermissibly paid a sub-minimum tip credit wage rate because they were required to perform duties unrelated to their tipped occupation for which they were not paid at the regular minimum wage rate. (Mem. Op. & Order, Mar. 2, 2010 at 46-47.) [Dkt 231.]

Pursuant to Federal Rule of Civil Procedure Rule 26(a)(2)(B), defendants disclosed the report of their proffered expert Michael Vucurevich. (Pls.' Mot., Ex. 1., Rpt. Michael Vucurevich.) Plaintiffs' present motion asks the court to strike the report and to bar Mr. Vucurevich from providing opinion testimony in this case.

After reviewing the parties' submissions and the transcript of Mr. Vucurevich's deposition,

the court ordered a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) , which was held on July 7, 2011, and at which Mr. Vucurevich testified.[1]


**B.     Mr. Vucurevich's report and opinions**

Mr. Vucurevich proposes to testify to two opinions set out in his report.  First, he opines that AppleIllinois' practice of requiring servers to contribute 2.5% of gross sales each day to a tip pool (a "2.5% tip pool contribution") is customary and reasonable within the casual dining segment of the restaurant industry.  (Vucurevich Rpt. at 5.)[2]  Second, he lists the duties that, in his opinion, are related to various tipped occupations.  (*Id.* at 5-6, 11-18, 26-29.)  This is offered in support of AppleIllinois' practice of having tipped employees perform some or all of those duties while being paid at the tip credit rate.

Mr. Vucurevich's opinions are based entirely on his experience working in the restaurant business, and not on any formal education or classroom training.  (Hrg. 10:58:20.)  In addition to his memory and general understanding of restaurant practices, Mr. Vucurevich was assisted by an employee, Megan McCrea, and by his business partner, Dan Simons, in compiling and drafting the report.  (Defs.' Resp. Ex. 2, Dep. Michael Vucurevich at 77, 88; Hrg. 3:25:40.)  Ms. McCrea also obtained information from contacts at nine restaurant chains in an attempt to determine if Mr. Vucurevich's experience was in line with wider industry practice.  (Vucurevich Rpt. at 10; Vucurevich Dep. at 137.)

---

[1] No transcript of that hearing has yet been prepared; references to the hearing are to the time reflected on the court's recording system.

[2] The "casual dining" segment of the restaurant industry is discussed further below.

## LEGAL STANDARDS

Federal Rule of Evidence 702, which governs the admission of expert witness testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert*, the Supreme Court emphasized the "gatekeeping" role of the federal trial judge in ensuring that expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589, 597. To make this determination, courts consider: (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline; and (3) whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *See Myers v. Ill. C. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 702 advisory comm. nn. (2000 Amends.)).

Mr. Vucurevich based his opinions in this case on his experience in the restaurant industry. He is not an academic; he is a consultant and businessman. Except for Ms. McCrea's calls to others in the restaurant industry, Mr. Vucurevich conducted no research before preparing his report. Rule 702 permits testimony by an expert whose qualification is based on experience. Fed. R. Evid. 702 and advisory comm. nn. (2000 Amends.); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

4

An expert's opinion based solely on experience, however, still must "be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir. 1999); *accord Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 761 (7th Cir. 2010). The expert must "explain the 'methodologies and principles' that support his opinion; he cannot simply assert 'a bottom line.'" *Metavante*, 619 F.3d at 761 (quotation omitted). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory comm. nn. (2000 Amends.) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995); *accord Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Metavante*, 619 F.3d at 761. The court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

## DISCUSSION

Plaintiffs object that Mr. Vucurevich's opinions are neither relevant nor reliable. (Pls.' Mot. Exclude at 2.) They argue that Mr. Vucurevich's opinions impermissibly draw legal conclusions and that evidence as to industry standards and customs is inadmissible in FLSA cases. (*Id.*; Pls.' Reply at 2.) Plaintiffs also argue that the report lacks well-grounded reasoning or methodology, and that Mr. Vucurevich lacks specialized knowledge or sufficient qualifications to opine on practices across

the casual dining segment of the restaurant industry. (Pls.' Mot. Exclude at 9, 11-13, 14-15.) They further point to certain aspects of the report to cast doubt on its reliability. (*Id*. at 10-14.)

Defendants respond that Mr. Vucurevich is not offered as an expert on legal issues but rather to testify on restaurant industry practices as they relate to tip pool contributions and the duties related to various occupations. Defendants argue that Mr. Vucurevich's opinions are well supported by his more than 35 years' experience in the restaurant industry. (Defs.' Resp. at 8-10, 12-13.) Defendants further assert that plaintiffs' challenges to the extent of Mr. Vucurevich's experience or certain of his conclusions go to the weight of his testimony and not its admissibility under Rule 702. (*Id*. at 9-10.)

A.      **Mr. Vucurevich's qualifications as an expert**

Mr. Vucurevich has worked in the restaurant business since 1974, when he began as a non-tipped employee in the kitchen of the Sacramento location of a restaurant chain called Victoria Station. (Vucurevich Dep. at 18-19.) Within a year of starting he was promoted to manager and attended the chain's management training program. (*Id*.) After the training program, he worked as a kitchen manager at Victoria Station locations throughout the United States and in Quebec, and was then promoted to "Front of the House" manager at the Victoria Station in Sacramento where he began. (*Id*. at 21-22.)[3] After six months in that position, he was promoted to general manager of the Victoria Station restaurant in Lake Tahoe, Nevada. (*Id.* at 22; Vucurevich Rpt. at 21.)

Following his work with the Victoria Station restaurant chain, Mr. Vucurevich was hired as

---

[3] "Front of the House" or "FOH" refers to the area of the restaurant to which diners have access. (Mem. Op. & Order, Mar. 2, 2010 at 33 n. 14.)

6

a manager for Restaurants Unlimited, a company that owned a string of casual dining restaurants. (Vucurevich Dep. at 23-24.) Following five years of managing restaurants on the west coast, he was hired in 1986 as Director of Operations for the Cheesecake Factory. (*Id*. at 25-26, 29, Vucurevich Rpt. at 21.)

Over the next ten years, the Cheesecake Factory expanded from two to 14 restaurants. (Vucurevich Dep. at 27.) Mr. Vucurevich hired restaurant managers and worked with restaurant management on day-to-day operations. (*Id*. at 27, 29.) Mr. Vucurevich testified that, during his time hiring managers for the Cheesecake Factory, he learned about other restaurants by asking management interviewees about the current practices in restaurants where they worked. (*Id*. at 63.) Mr. Vucurevich worked in each new Cheesecake Factory location as it opened, including one that opened in Chicago in 1994, and stayed in each new restaurant for amounts of time ranging from three months to one year. (*Id*. at 30-31, 39; Hrg. 11:08:00-11:13:00.)

In 1996, Mr. Vucurevich took a position as Chief Operating Officer for "eatZi's," a take-out food market. (Vucurevich Dep. at 43-45, 47; Vucurevich Rpt. at 20.) That operation did not use tipped employees. (Hrg. 11:12:30.) Following his time there, he was hired to be Chief Operating Officer for Al Copeland's restaurant holding company, responsible for the operations of 40 to 45 casual dining restaurants (including franchisees) located throughout the southern and central United States. (Vucurevich Dep. at 47-49.)

Since 2004, Mr. Vucurevich has run a restaurant consulting business, Vucurevich Simons Advisory Group (VSAG), with Dan Simons, a former Cheesecake Factory and eatZi's colleague. (*Id*. at 67; Vucurevich Rpt. At 20.) Mr. Vucurevich operates out of Texas, while Mr. Simons is located in Washington, D.C. (Vucurevich Dep. at 69-70.) VSAG has consulted for businesses

including PepsiCo, Silver Dollar, Jimmy Nichols, Café Deluxe and numerous small restaurant operations. (Hrg. 11:22:00, 11:27:30.) His consulting focus over the last several years has been on restaurant concept development, which includes developing a restaurant's style and menu. (Hrg. 10:59:50.) VSAG regularly employs contractors to assist in other consulting projects. (Hrg. 11:25:10.) It is VSAG's policy to undertake an analysis of the operations of all new clients, including a survey of the client's current staffing levels and tip pooling practice. (Hrg. 3:36:30.) VSAG also gives advice to businesses about tip-out procedures and contribution percentages. (Vucurevich Dep. at 87; Vucurevich Rpt. at 9.) Mr. Vucurevich testified that one of VSAG's main goals in carrying out its consulting business is to ensure that there is sufficient cost savings or profit generation from VSAG's recommendations to justify their consulting fees. (Hrg. 11:31:00.) VSAG also currently runs one restaurant in Washington, D.C., with another scheduled to open in October 2011. (Hrg. 11:20:30.)

Mr. Vucurevich has authored no publications in the past ten years nor previously testified as an expert. (Vucurevich Rpt. at 4.) He has not received any formal education or training on the restaurant industry as a whole. (Hrg. 10:58:20.)

Mr. Vucurevich has substantial experience in the restaurant business, but that experience is limited to the management perspective. For example, he has never worked as a tipped employee except for a brief time (90 days) as part of his management training. (Hrg. 1:51:05.) His experience is also limited in scope. Mr. Vucurevich's experience has been in the "casual dining" segment of the restaurant industry, which he defined as full service restaurants with a price point for entrees between ten and twenty dollars. (Hrg. 11:37:25.) He testified that there is a spectrum of restaurants within the casual dining industry, from family dining restaurants (which usually lack a bar) and mid-

8

range restaurants, to the more upscale end of the range, which generally charge more for entrees and have more elaborate decor.  (Hrg. 11:38:00-11:46:00.)

Even within the casual dining segment, most of Mr. Vucurevich's experience has been with restaurants higher on the spectrum than Applebee's. (Hrg. 11:38:00, 11:54:10.)  The Cheesecake Factory, where he spent a considerable number of years, ranks on the "upscale" end of the spectrum, he testified, whereas he would place Applebee's in the lower, "family" end of the spectrum.  (*Id*.)  He has never worked for Applebee's in any capacity and did not attempt to base any of his opinions on Applebee's actual operations.  (Hrg. 11:54:30, 2:45:00.)  He has had no personal professional experience with a number of large national chains including Red Lobster, Olive Garden, International House of Pancakes, Steak & Shake, Baker's Square, and Ruby Tuesday.  (Hrg. 11:44:00, 11:59:00.) Although he did some consulting for Denny's restaurants, his work was limited to training staff in principles of guest hospitality, and not on any wage and hour issues that would be relevant to this case.  (Hrg. 11:23:20.)

Mr. Vucurevich's 35 years of experience in the restaurant industry, particularly his work in and observation of casual dining restaurants, provides a basis of specialized knowledge as contemplated under Federal Rule of Evidence 702.  A further issue, however, is whether Mr. Vucurevich is qualified to offer the specific opinions he proposes.  That must be determined "by comparing the area in which [he] has superior knowledge, skill, experience, or education with the subject matter of [his] testimony." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 816 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). Defendants have the burden of demonstrating that Mr. Vucurevich's experience is a sufficient basis for each of his two opinions.

9

### B.     AppleIllinois' 2.5% mandatory tip pool contribution

A tip pool is a system whereby workers who receive tips directly from customers contribute a portion of the tips they receive to a pool which is then distributed to other workers. (Mem. Op. & Order, Mar. 2, 2010 at 8-9.) Mr. Vucurevich opines that a mandatory tip pool contribution of 2.5% of gross sales is both customary and reasonable. (Vucurevich Rpt. at 5.) He bases this opinion on professional experience as well as an informal series of interviews conducted by Ms. McCrea. (*Id.* at 10; Hrg. 1:37:10.) He states that he personally observed mandatory tip pool contribution percentages between 2% and 4%, and that in his consulting business he recommends that his clients use a tip pool contribution of 3% of gross sales. (Vucurevich Rpt. at 7, 9.) He also outlines his understanding of the rationale behind tip pooling as a general practice and the reasons behind using gross sales rather than collected tips as the basis for a tip pool contribution. (*Id*. at 8.)

Mr. Vucurevich testified that he has had experience with tip pools throughout virtually all of his 35 years of experience in the restaurant industry. (Hrg. 1:32:25.) He testified that he uses tip pool contribution data as a basic metric in making managerial decisions, both in restaurants over which he had responsibility as well as in his consulting business today. (Hrg. 11:31:00, 1:33:00.) Mr. Vucurevich learns from his clients what their tip pool contribution percentage is, which employees receive the pooled tips and in what amounts, and whether or not the tip pool can support the client's overall staffing structure. (Hrg. 11:29:30.)

The court concludes that some, but not all, of Mr. Vucurevich's proposed testimony about tip pools meets the standards of Rule 702. From his years of observing the way tip pools work, he is qualified to testify about the mechanics of tip pools, that is, how he has observed them operate in restaurants. He may also testify about the tip pool percentages he has seen. These are not opinions

10

per se, but a witness who is qualified as an expert may testify "in the form of an opinion or otherwise." Fed. R. Evid. 702; *see Trustees of Chi. Painters & Decorators Pens. Funds v. Royal Intl. Drywall & Decorating, Inc.*, 493 F.3d 782, 787-88 (7th Cir. 2007) (expert testimony based on specialized knowledge and not subjective belief or speculation is reliable).

Mr. Vucurevich's experience, however, is an insufficient basis from which to opine or testify about the entire casual dining segment of the restaurant industry, and he lacks a reliable basis to opine that AppleIllinois' tip pool practice is customary and reasonable. "[E]xperts' work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (quoting *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000)).

Mr. Vucurevich's proffered opinions are significantly broader than his experience supports. By opining that certain practices or tip percentages are "customary," he extrapolates that his experience is representative of the casual dining segment of the restaurant industry, and in particular, Applebee's. Defendants have provided no evidentiary support for that extrapolation. Not only is Mr. Vucurevich's experience of the casual dining segment limited, he does not know what proportion of that segment his experience represents. Mr. Vucurevich admitted that he does not know how many casual dining restaurants there are in the United States, perhaps "thousands." (Vucurevich Dep. at 115, 135.) His experience relates to chain restaurants, but there are "a lot of mom-and-pop restaurants that are out there that are independents." (*Id*. at 115.) He has done no research about them. As described above, he has considerable experience in *some* restaurants in a certain part of the spectrum of casual dining, but no experience with other large restaurant chains. Notably, most of his experience is with chains like the Cheesecake Factory that are further up the

11

spectrum than Applebee's. He did not make an effort to make up for this gap in knowledge. (Hrg. 11:43:00.) He conducted no industry-wide research nor did he consult with any industry publications to inform his opinions. (Hrg. 11:04:00.) Furthermore, his opinions were formed based chiefly on his memory, rather than a verifiable body of quantitative data. (Hrg. 3:14:50.) Since Mr. Vucurevich lacks data beyond his limited personal experience, one cannot reliably conclude that his personal experience is representative of what is "customary" in the restaurant industry or even in the casual dining segment.

The informational interviews conducted by Ms. McCrea do not sufficiently make up for the gaps in Mr. Vucurevich's knowledge. The fact that Ms. McCrea rather than Mr. Vucurevich conducted the interviews, would not, of itself, make the opinions inadmissible. "An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify." *Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612-13 (7th Cir. 2002). Mr. Vucurevich testified that all of the opinions in the report were his own and that he had supervised the report's drafting. (Vucurevich Dep. at 77, 88-89; Hrg. 3:25:30.) The problem, rather, is the nature of the assignment Ms. McCrea was given, which was not designed to be a statistically valid survey.

Mr. Vucurevich formed his opinion on what is a reasonable and customary tip pool based on his experience and then directed his staff to reach out to contacts to see whether their experience in their respective restaurants was consistent with his experience. (Vucurevich Rpt. at 10; Hrg. 1:38:00.) Ms. McCrea contacted individuals that Mr. Vucurevich or other employees of VSAG knew from previous dealings. (Hrg. 3:25:40.) Ms. McCrea obtained information from contacts at nine restaurant chains, eight of whom reported some sort of mandatory tip pooling practice. (Pls.'

12

Mot. Exclude, Ex. 6.) Although Mr. Vucurevich believed these nine contacts represented a significant share of the industry, no effort was made to determine if that belief was correct. (*See* Hrg. 1:42:00-1:44:00.) No steps were taken to confirm the accuracy of the contacts' information or to confirm whether their reports represented uniform practices throughout the chains in which they worked. (*Id*.) Although Mr. Vucurevich characterizes these chains as "bellwether" companies, no research or testing was performed to determine whether the group with whom Ms. McCrea communicated was actually representative of the casual dining segment of the restaurant industry. (Hrg. 1:42:45.) In fact, Mr. Vucurevich testified that he is not claiming that the sources were representative. (Vucurevich Dep. at 133.) Rather, the results of Ms. McCrea's select interviews reinforced his personal belief. (*Id*.)

In presenting the results of Ms. McCrea's contacts with other restaurants with charts and graphs and reporting the average and modal tip pool contribution percentages, Mr. Vucurevich's report affects a veneer of statistical rigor that has no basis in fact. It *appears to be* a scientific survey, but even Mr. Vucurevich admitted that it was not. At best, this "reality check" served as a selective confirmation of Mr. Vucurevich's personal impressions. (Hrg. 1:44:10.) A statistically valid survey of the practices of the restaurant industry, or its casual dining segment, if it had been undertaken, might have been admissible to demonstrate what is "customary." *See Zenith Elec. Corp. v. WH-TV Broad. Corp.* 395 F.3d 416, 419 (7th Cir. 2005) (suggesting that a calculation of lost profits might have been reliable under Rule 702 using multiple regression analysis); *Cummins v. Lyle Indus.*, 93 F.3d 363, 369 (7th Cir. 1996) (noting that some opinions lend themselves to testing and substantiation by the scientific method). Important components of such research include an analysis of the reliability of the sample tested and an understanding of the relevant population of restaurants

13

and the sample size in comparison to that population. That analysis is lacking here. The court concludes that Mr. Vucurevich's opinion that 2.5% is a customary mandatory tip pool contribution is not sufficiently supported to be admissible under Rule 702.

Similarly, Mr. Vucurevich's conclusion that 2.5% is "reasonable" does not meet the standards of Rule 702. He opines that "[w]orking full time, a server can undoubtedly earn enough tips to deduct a reasonable tip out of between two and four percent of gross sales and still earn a fair annual salary." (Vucurevich Rpt at 7.) Although the discussion is presented in a way which suggests a high level of precision, it is based on numbers with no apparent statistical support. For example, he states, "In my experience, the average annual income of a full time server within the causal dining segment ranges between $24,000 and $40,000 per year." (*Id.*) As discussed above, Mr. Vucurevich has experience in only part of the casual dining segment, none with Applebee's itself, and most of it with restaurants more "upscale" than Applebee's. Apparently, he did not get information from Applebee's or any other source such as the Bureau of Labor Statistics about the actual annual income of restaurant servers. Rather, Mr. Vucurevich testified, the numbers represent what servers have the potential to earn. (Vucurevich Dep. at 125.) He drew those numbers from his recollection and general understanding of what servers in his restaurant earn, which he tracks through credit card statements. The single other source cited in his report is a *Wall Street Journal* article from October 2008 about the average server gratuity. (Vucurevich Rpt. at 7 n. 2.) That article, he explained, made intuitive sense to him based on his experience. (Hrg. 1:10:45, 3:45:00.) The opinion of a Rule 702 expert "has a significance proportioned to the sources that sustain it." *Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999) (internal quotations and citation omitted). Mr. Vucurevich's opinion is simply not based on sufficient data.

This is not to suggest that Mr. Vucurevich is not good at his profession, which is consulting for restaurant management. His experience and the type of confirmatory checking Ms. McCrea undertook may be all his clients need for the purpose for which they engage him; that is, advising restaurant managers how to generate additional profit. (*See, e.g.,* Vucurevich Rpt at 9-10 (describing the recommendations he gives to his clients about tip pools).) However, it does not supply a sufficiently reliable basis under the standards of Rule 702 to allow his opinion that Applebee's practice of a 2.5% tip pool is customary and reasonable to be admitted at trial in this case.

Mr. Vucurevich's proposed opinion is different from the opinion rendered by the expert in *Metavante Corp. v Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010). In that case, the seller of electronic banking service products sued to get payment from a bank that had bought its products. The plaintiff's expert testified, based on his experience, that the plaintiff's performance in providing technology was reasonable and consistent with the expectations in the industry because it enabled the bank to meet its financial objectives, which is the perspective from which he had seen banks such as the defendant measure that performance. *Id.* at 761-62. Here, Mr. Vucurevich proposes to testify about the reasonableness of AppleIllinois' tip pool policy, but the issue is not only whether the policy meets the needs of the restaurant owner, which is Mr. Vucurevich's usual perspective, but rather whether it meets a broader definition of reasonableness, encompassing more than just the economic goals of management. Mr. Vucurevich's professional experience has not prepared him to render an opinion from that point of view. His attempt to fill that gap with some unidentified recollections of what his tipped employees earn and a single article from the Wall Street Journal lacks any reliable basis in facts or data.

Therefore, although Mr. Vucurevich is qualified to testify as to some of his proposed subject

matter, he lacks a sufficient basis to testify to all of it. Even if Mr. Vucurevich is an experienced professional, testimony that is not sufficiently supported cannot be allowed. *See Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825-26 (7th Cir. 2010) (calling testimony beyond a witness's expertise and unsupported by reliable methodologies "at best . . .an 'inspired hunch.'").

In sum, Mr. Vucurevich is qualified to testify on the mechanics and structure of tip pools that he has observed, including the tip pool percentages he has observed. That testimony may "assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702. Information regarding the mechanics of tip pools in general, including the tip pool contribution percentages in certain restaurants, may provide useful background information to the trier of fact. "[An] expert's testimony need not relate to the ultimate issue in order to be relevant under Rule 702." *Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000). The limitations of his experience are proper subjects for cross-examination, but go to the weight rather than admissibility of that permitted testimony. He may not testify that AppleIllinois' tip pool practice is customary and reasonable or mention the contacts he or his team made in the course of preparing his expert report. Part III-C and Exhibit C of Mr. Vucurevich's report are stricken.[4]

This is not a final ruling about relevance of such testimony, and thus, is not a ruling about the ultimate admissibility of such testimony. That ruling will be made when the evidence is proffered.

---

[4] Because Mr. Vucurevich will not be testifying about whether AppleIllinois' tip pooling policy is customary or reasonable, it is unnecessary to decide plaintiff's objections that such testimony would present legal conclusions.

16

### C.     Related duties of tipped employees

Mr. Vucurevich's second opinion defines the duties that he considers "related" to the tipped

occupations of server, bartender, host, and "to-go/carside" employee. (Vucurevich Rpt. at 11.) This

is offered in connection with plaintiffs' claim that they were required to perform duties for which

they should have been paid the minimum wage, not the tipped credit rate.  The Department of Labor

regulations provide that an employer may take a tip credit "only for hours worked by [an] employee

in an occupation in which [he] qualifies as a 'tipped employee.'"  29 C.F.R. § 531.59(b).  The

regulations recognize that in some situations, however, an employee may be employed in a dual job,

such as a hotel maintenance employee who is simultaneously employed as a waiter.  29 C.F.R.

§ 531.56(e).  The regulations further recognize:

> Such a situation is distinguishable from that of a waitress who spends part of her time
> cleaning and setting tables, toasting bread, making coffee and occasionally washing
> dishes or glasses.  It is likewise distinguishable from the counterman who also
> prepares his own short orders or who, as part of a group of countermen, takes a turn
> as a short order cook for the group.  Such *related duties* in an occupation that is a
> tipped occupation need not by themselves be directed toward producing tips.

*Id.* (emphasis added).  Part of the dispute between the parties, therefore, is what is a "related duty"

to a plaintiff's tipped occupation.  (*See* Mem. Op. & Order, March 2, 2010 at 36.)

Mr. Vucurevich's report includes his descriptions and rationales for specific duties, including

cleaning and dishwashing, as related to tipped occupations, the functions of various tipped

occupations, and an exhibit that presents a non-exhaustive list of related duties.  (Vucurevich Rpt.

at 11-18, 26-29.)  With a few exceptions, such as cooking at a cooking station for an entire shift or

washing dishes all day long, Mr. Vucurevich regards virtually all restaurant tasks as "related" duties

for a server.  (*Id.* at 11-12, 18; Vucurevich Dep. at 151; Hrg. 1:55:47, 2:44:00.)  Those include

cleaning the server's area with wood polish and brass polish, and bathroom cleaning in the middle of a shift.  (Vucurevich Rpt. at 27; Hrg. 2:51:47-52.)  In his view, even bathroom cleaning after the restaurant closes could be "sidework" of a tipped employee.  (Hrg. 2:53:30.)  Mr. Vucurevich explained his reasoning in allocating duties in a restaurant, specifically, that all efforts should be directed towards rapid customer service, and that anything that keeps servers away from their tables for any substantial period of time should be avoided.  (Hrg. 1:56:15, 2:07:10.)  But when he recommends assigning duties, he focuses on lean staffing to maximize efficiency and profitability.  (Hrg. 2:05:00.)

Mr. Vucurevich bases his opinion on his personal experience managing restaurants, setting restaurant staffing policies, and observing the practices of his consulting clients.  (Vucurevich Rpt at 4, 6; Hrg. 2:50:30.)  Again, Mr. Vucurevich's experience qualifies him to testify about his observation of the allocation of duties in the restaurants in which he has worked and provided consultation services.  Mr. Vucurevich is able to describe the duties he has seen tipped employees perform and those he has seen non-tipped employees perform based on his many years of personal observation.  (Vucurevich Rpt. at 5-6; Vucurevich Dep. at 149-50.)  As to that proposed area, therefore, Mr. Vucurevich's experience provides a reliable basis for testimony.

Here too, however, his experience is limited.  He has formed opinions as to related duties based on his observations in certain restaurants, but he does not know what proportion of the industry this encompasses, nor does he know whether there is any variance in the distribution of duties along the spectrum of casual dining restaurants.  (Hrg. 11:44:00-11:54:00.)

More importantly, his description of what constitutes a "related" duty is not based on any distinction that is meaningful in this case.  He knows that there is a distinction between the work that

18

tipped employees can do and work that must be performed by individuals that are paid at least the minimum wage, but he cannot define it. (*See* Hrg. 1:53:40, 2:12:50.) He has done no research on distinguishing employees who may receive tip-credit wages from those who must receive at least the full minimum wage. (Hrg. 2:03:30-2:08:00.) He has observed workers in dual occupations, such as servers who also work shifts as cooks, but he has never addressed the wage requirements for such workers. (Hrg. 1:51:45.) Instead, he views a restaurant's decision about whether to pay at a minimum wage rate or a tipped rate as "self-governing." (Hrg. 2:13:50.)[5] The distinction he draws is not the nature of the task but the efficiency of assigning the task to a tipped or wage employee (that is, an employee paid at the minimum wage). For example, he testified, that an "expo" position can be either a tipped position or a wage position, depending on how busy the restaurant is. (Hrg. 2:16:00.)

It became clear at the hearing that Mr. Vucurevich's view of what a server can be required to do as "sidework" or a "related duty" focuses on the efficient running of the restaurant for purposes of maximizing profits, without any consideration of the Department of Labor regulations. He has never advised as to how many hours in a day a tipped employee may perform non-tipped duties. (Hrg. 2:03:45.) Likewise, he has never identified what portion of an eight hour day a tipped employee could perform non-tip-producing activities at a tip-credit rate, nor has he looked beyond overall restaurant efficiency in choosing what duties he believes should be assigned to tipped

---

[5] Mr. Vucurevich explained that restaurants have to govern themselves with regard to the allocation of duties because they are in a competitive, high turnover business. (Hrg. 2:03:30.) They must schedule and allocate work to ensure that tipped employees are actively deployed but not doing so many ancillary tasks that they are not earning enough in tips. (Hrg. 11:32:00, 2:03:50.) In his opinion, "if the . . . worker doesn't make enough money or they don't get enough hours, then they're [going to] go work down the street." (Hrg. 11:33:30.)

19

employees. (Hrg. 1:55:30, 2:05:00.) That is illustrated by the example he gave of assigning tipped employees to do cleaning work after the restaurant closes if the restaurant is slow and cannot afford to hire a separate cleaning service. (Hrg. 2:21:00, 2:53:00.)

Mr. Vucurevich's opinion about what duties are related to the tipped occupations of server, bartender, host, and "to-go/carside" employee suffer from the same deficiencies as his tip pool opinions in that he has extrapolated from his limited experience to the entire restaurant industry or even to the entire casual dining segment. But additionally, his opinion is not helpful to the trier of fact because he is responding to a different question. He is not opining as to what duties require a tipped employee to be paid a wage rate. He is answering the question that his clients ask, which is: what is the most efficient and cost-effective way to assign the tasks in a restaurant.

Mr. Vucurevich may not testify as to whether a particular duty is "related" to a tipped occupation for the purposes of 29 C.F.R. § 531.56, or that his experiences are representative of practices in restaurants he has not observed.[6] *See Wintz v. Northrop Corp.*, 110 F.3d 508, 513-14 (7th Cir. 1997) (finding district court properly barred expert testimony where expert was not sufficiently qualified in area of proffered testimony). He may however, describe the methods of allocating duties that he has used or observed, and the reasoning behind those methods.

That testimony may be helpful to the trier of fact. *See Smith*, 215 F.3d at 721 (testimony need only be relevant to any fact in issue; it need not relate directly to ultimate issue to be resolved by trier of fact). His observations as to duties he has seen tipped workers perform may provide a useful background and framework for the trier of fact in considering the practices at issue here.

---

[6] Here too, it is therefore unnecessary to determine whether such testimony would present legal conclusions.

20

Again, this is not a final ruling about relevance of such testimony, and thus, is not a ruling about the ultimate admissibility of such testimony.  That ruling will be made when the evidence is proffered.

## CONCLUSION

For all of the reasons set forth above, plaintiff's Motion to Exclude the Report of Michael Vucurevich [Dkt 271] is granted in part and denied in part, as set forth in this opinion.

IT IS SO ORDERED.

_____
Geraldine Soat Brown
United States Magistrate Judge

Date: September 9, 2011