| | |
|---|---|
| **GLENN DRIVER, DEMIKO D.** ) | |
| **MCCASTER, ROSAMAR MALLARI,** ) | |
| **JOYCE A. BRITTON, and MICHAEL** ) | **Case No. 06 C 6149** |
| **H. HICKS, on behalf of themselves and** ) | |
| **all other persons similarly situated,** ) | |
| **known and unknown,** ) | **Magistrate Judge Geraldine Soat Brown** |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **APPLEILLINOIS, LLC d/b/a** ) | |
| **APPLEBEE'S NEIGHBORHOOD** ) | |
| **GRILL & BAR, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

The named plaintiffs in this case are former employees of AppleIllinois, LLC

("AppleIllinois"), who worked in tipped positions such as servers or bartenders.  Plaintiffs brought

several claims against AppleIllinois, and several classes were certified.[1]  One of the claims for which

a class was certified was the so-called "dual jobs" claim under the Illinois Minimum Wage Law, 820

Ill. Comp. Stat. §§ 105/1 *et seq*. ("IMWL"), described further below.  The named plaintiffs brought

claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. ("FLSA") on behalf of

---

[1] Plaintiffs also name as defendants certain members and managers of AppleIllinois. (Third Am. Compl. ¶¶ 8-16.) Plaintiffs dismissed their claims against defendants Don Gravel, Kate A. Pino and Christopher Summers without prejudice, and against defendant J. Timothy Brugh with prejudice. (Dkt 198, 202, 343.)  This opinion refers to all remaining defendants collectively as "AppleIllinois."

themselves only.  (Third Am. Compl. Cnts. IV and V.)  [Dkt 141.]  The named plaintiffs' Count IV

parallels the plaintiff class's dual jobs claim but is brought under the FLSA.

Now the plaintiff class and the named plaintiffs on one hand and AppleIllinois on the other

hand have filed cross-motions for summary judgment on the dual jobs claims.  (Pls.' Mot. [dkt 297];

Defs.' Mot. [dkt 353].)  For the reasons set out below, plaintiffs' motion is granted, and

AppleIllinois' motion is denied.[2]

## BACKGROUND

I.    **Legal framework**

A.    *The IMWL and FLSA*

The class claim at issue is brought under the IMWL.  That law requires employers to pay

workers (with some exceptions) a minimum hourly rate.  820 Ill. Comp. Stat. §105/4(a)(1).

However, it also provides:

> Every employer of an employee engaged in an occupation in which gratuities have
> customarily and usually constituted and have been recognized as part of the
> remuneration for hire purposes is entitled to an allowance for gratuities as part of the

---

[2]    The parties' briefs on the motions are cited as follows: Memorandum in Support of
Plaintiffs' Motion for Summary Judgment on Liability on Counts I and IV: Non-Tipped Duties Paid
at Tip Credit Rate ("Pls.' Mem.") [dkt 298]; Memorandum by Defendants AppleIllinois, LLC, W.
Curtis Smith, Archie Iodice, Jerry Kreger, and Doreen Borke, Executrix of the Estate of James
Borke, in Opposition to Plaintiffs' Motion for Summary Judgment on Liability on Counts I and IV:
Non-Tipped Duties Paid at Tip Credit Rate ("Defs.' Opp'n.") [dkt 308]; Reply in Support of
Plaintiffs' Motion for Summary Judgment on Liability on Counts I and IV: Non-Tipped Duties Paid
at Tip Credit Rate ("Pls.' Reply") [dkt 318]; Memorandum by Defendants AppleIllinois, LLC, W.
Curtis Smith, Doreen Borke, Executrix of the Estate of James Borke, Jerry Kreger, and Archie Iodice
in Support of Their Motion for Summary Judgment on Plaintiffs' Dual-Jobs Claims ("Defs.' Mem.")
[dkt 354]; Plaintiffs' Response in Opposition to Defendants' Motion for Partial Summary Judgment
on Plaintiffs' Non-Tipped Duties Claim ("Pls.' Opp'n.") [dkt 359].  All exhibits and Local Rule 56.1
statements are cited to the docket number.

> hourly wage rate . . . .  The Director shall require each employer desiring an allowance for gratuities to provide substantial evidence that the amount claimed, which may not exceed 40% of the applicable minimum wage rate, was received by the employee in the period for which the claim of exemption is made, and no part thereof was returned to the employer.

820 Ill. Comp. Stat. § 105/4(c).  That allowance is the "tip credit."

The FLSA likewise allows an employer to take a tip credit.  Under the definition of "wage," the amount paid to a "tipped employee" can include an "amount on account of tips" received by such employee, subject to certain conditions.  29 U.S.C. § 203(m).  "'Tipped employee' means any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."  29 U.S.C. § 203(t).

The FLSA is relevant to the class's IMWL claim because the IMWL parallels the FLSA and the same analysis has generally been applied to both statutes.  *See, e.g., Condo v. Sysco Corp.*, 1 F.3d 599, 601 n. 3 (7th Cir. 1993) (adopting parties' agreement that FLSA and IMWL are coextensive, as supported by the Illinois Administrative Code and Illinois case law); *Williams-Green v. J. Alexander's Rests., LLC*, 277 F.R.D. 374, 378 (N.D. Ill. 2011); *Ladegaard v. Hard Rock Concrete Cutters, Inc.,* No. 00 C 5755, 2004 WL 1882449 at *4 (N.D. Ill. Aug. 18, 2004) (citing *Haynes v. Tru-Green Corp.*, 507 N.E.2d 945, 951 (Ill. App. 4th Dist. 1987)); *O'Brien v. Encotech Constr.,* No. 00 C 1133, 2004 WL 609798 at *7 (N.D. Ill. Mar. 23, 2004).

The Illinois Administrative Code provides that the Director of the Illinois Department of Labor, in interpreting the IMWL and regulations thereunder, may look to the United States Department of Labor's regulations and interpretations of the FLSA.  Ill. Admin. Code tit. 56, pt. 210.120 (2012).  But the Code also provides that where there are concurrent state and federal powers, the stricter of the two shall prevail.  Ill. Admin. Code tit. 56, pt. 210.100 (2012).  Thus, if

there is a difference in the interpretation of the IMWL and FLSA, the IMWL is more favorable to the employee.[3]

### B.    *The dual jobs claim*

An employer may take a tip credit "only for hours worked by [an] employee in an occupation in which [he] qualifies as a 'tipped employee.'" 29 C.F.R. § 531.59(b).  Under either the FLSA or the IMWL, that means an occupation in which tips are customarily and regularly paid.  820 Ill. Comp. Stat. § 105/4(c); 29 U.S.C. § 203(t).  In contrast,

> [a]n employee employed full time or part time in an occupation in which he does not receive more than $30 a month in tips customarily and regularly is not a "tipped employee" within the meaning of the Act and must receive the full compensation required by its provisions in cash or allowable facilities without any deduction for tips received under the provisions of section 3(m).

29 C.F.R.§ 531.56(a).

The regulations recognize that in some situations, an employee may be employed in a "dual job," such as a hotel maintenance employee who also serves as a waiter.  29 C.F.R. § 531.56(e).  In such a situation, the employee is considered employed in two occupations and is a tipped employee only for the time he works as a waiter; the employer may not take a tip credit for the time the employee spends in his occupation of maintenance worker and must pay the employee at least the full minimum wage for that time.  *Id.*  The regulation further recognizes:

---

[3]  Initially, AppleIllinois agreed that FLSA precedent is applicable to interpretation of the IMWL (*see* dkt 178 at 2), but recently AppleIllinois' position has been less clear *(see* Defs.' Opp'n at 7 n. 5 (stating that "the IMWL and FLSA have numerous differences that the courts have recognized")).  AppleIllinois does not, however, show how the FLSA and the IMWL differ on the issue of the tip credit, and if they differ, how that difference is more favorable to the employer under the IMWL in light of the Illinois Administrative Code directive.

> Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips.

29 C.F.R. § 531.56(e) (hereinafter the "dual jobs regulation"). The employer must maintain and preserve records that show, among other things, which employees are paid in part by tips, and, for those employees, how many hours in each workday are worked in occupations in which the employee receives tips and how many are worked in any occupation in which the employee does not receive tips. 29 C.F.R. § 516.28(a)

The Department of Labor's 1988 Field Operations Handbook interprets the dual jobs regulation:

> Reg 531.56(e) permits the taking of the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips (i.e. maintenance and preparatory or closing activities). For example a waiter/waitress, who spends some time cleaning and setting tables, making coffee, and occasionally washing dishes or glasses may continue to be engaged in a tipped occupation even though these duties are not tip producing, provided such duties are incidental to the regular duties of the server (waiter/waitress) and are generally assigned to the servers. However, where the facts indicate that specific employees are routinely assigned to maintenance, *or that tipped employees spend a substantial amount of time (in excess of 20 percent)* performing general preparation work or maintenance, no tip credit make be taken for the time spent in such duties.

U.S. Dept. of Labor Field Operations Handbook Ch. 30d00(e) (Rev. 563) (Dec. 9, 1988) (emphasis added) (*available at* http://www.dol.gov) (last visited Aug. 24, 2012).


II.     **Procedural background**

A.     *Class certification*

Over AppleIllinois' opposition, the court certified several classes under Federal Rule of Civil

Procedure 23 for a number of plaintiffs' IMWL claims, including the "dual jobs" claim:

> On Plaintiffs' claim under the IMWL with respect to the issue of non-tipped duties performed for tip credit rate wages, a class is certified consisting of persons employed by Defendant AppleIllinois, LLC, from October 6, 2003, to the conclusion of this action, who worked as tipped employees earning a sub-minimum, tip credit wage rate, and who performed duties unrelated to their tipped occupation for which they were not paid at the minimum wage rate.

(Mem. Op. & Order, Mar. 2, 2010 at 47.) [Dkt 231.]

AppleIllinois sought interlocutory appeal of that decision, which was denied. [Dkt 234.] AppleIllinois' motion to decertify the class following the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __; 131 S.Ct. 2541; 180 L.Ed.2d 374 (2011) was also denied. [Dkt 333.]

### B.     *The* Fast v. Applebee's *case*

A significant development since the class was certified here is the decision by the Eighth Circuit in *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872 (8th Cir. 2011), a collective action case brought under the FLSA with a dual jobs claim virtually identical to the plaintiffs' dual jobs claims here. In its opinion upholding the district court's decision denying the employer's motion for summary judgment, the Eighth Circuit considered the FLSA, the dual jobs regulation, and the DOL's handbook and opinion letters regarding that regulation.

The court observed that the statutory text of 29 U.S.C. § 203(t) does not recognize the possibility of an employee performing more than one occupation for the same employer, and thus, the dual jobs test set out in the regulation is a creature of the DOL. *Fast,* 638 F.3d at 879. "The regulation, to which we owe *Chevron* deference, makes a distinction between an employee performing two distinct jobs, one tipped and one not, and an employee performing related duties

within an occupation 'part of the time' and 'occasionally.'" *Id.* (referring to *Chevron, U.S.A., Inc. v. Natl. Resources Def. Council, Inc.*, 467 U.S. 837 (1984)). But, the court observed, the regulation is itself ambiguous because it does not address an employee performing related duties more than part of the time or more than occasionally. *Id.* The DOL's interpretation contained in its Handbook, which concludes that employees who spend "substantial time" (more than 20%) performing related but non-tipped duties should be paid at the full minimum wage for that time without the tip credit, is not entitled to *Chevron* deference, but is entitled to deference under the standard of *Auer v. Robbins*, 519 U.S. 452, 461 (1997), that is, the interpretation is controlling unless plainly erroneous or inconsistent with the regulation. *Fast*, 638 F.3d at 878-79.

The question of which specific duties are subject to the 20% limitation was not finally determined by the court of appeals, which concluded only that the district court properly determined that the Handbook's interpretation governed the case. *Id.* at 881.

There is no such authority on point from the Seventh Circuit. In the absence of Seventh Circuit precedent, decisions by other courts of appeals, while not binding on a district court in the Seventh Circuit, are entitled to respectful consideration. *U.S. v. Glaser,* 14 F.3d 1213, 1216 (7th Cir. 1994); *Colby v. J.C. Penney Co., Inc.* 811 F.2d 1119, 1123 (7th Cir. 1987).


C.    *Current motions*

Both sides have moved for summary judgment on the dual jobs claims. Plaintiffs contend that AppleIllinois improperly paid employees at the tip credit rate for doing work that should have been paid at the minimum wage. AppleIllinois contests that conclusion, and argues that it is entitled to summary judgment because plaintiffs' claims are barred as a matter of law.

## FACTS

The parties have re-submitted many of the exhibits that were submitted in connection with the motion for class certification, including many of the previously-submitted declarations by current or former AppleIllinois employees.[4] The court has carefully re-reviewed those declarations, as well as the new materials submitted with the present motions. The facts are essentially uncontested. The dispute is about the legal consequences of the facts.

## I.     The parties.

The class members are current and former tipped employees of 38 Applebee's restaurant locations in Chicago and the Chicago suburbs. (Dkt 319 ¶ 1.) AppleIllinois employs various hourly employees, who are divided into tipped positions (servers, bartenders, hosts and carside employees) and non-tipped positions (general utility workers ("GU"), expediters ("Expo"), line cooks, prep cooks, and kitchen professionals). (*Id.* ¶¶ 1-2.)[5] All of the plaintiff class are present or former servers, bartenders, hosts or carside workers whom AppleIllinois paid at the tip credit rate. (Dkt 307 ¶ 7.)

AppleIllinois is an Illinois limited liability company that opened and operated approximately 38 Applebee's restaurants within Illinois, and currently owns and operates approximately 34

---

[4]     Approximately 60 of the 95 declarations that had been originally submitted by AppleIllinois in opposition to the motion for class certification (dkt 178) were refiled in connection with the present motion. (Dkt 299, Ex. T; Dkt 310, Exs. E-I.) Plaintiffs also resubmitted 42 of the 43 declarations they had submitted in support of the class certification motion. (Dkt 299, Ex. U.)

[5]     "Carside" or "curbside" employees handle take-out orders for the restaurant. (*See, e.g.,* Decl. Guadalupe Ibarra ¶ 24.)

Applebee's restaurants.  (Dkt 307 ¶ 6.)  Defendant W. Curtis Smith is the President, a member and a manager of AppleIllinois.  (Dkt 307 ¶ 9.)  Defendants James Borke, Archie Iodice and Jerry Kreger all are or were members of AppleIllinois.  (Dkt 150 ¶¶ 9, 11-12.)

## II.     AppleIllinois' classifications of employees and their duties.

### A.     *Tipped and non-tipped positions and hourly wage rates*

AppleIllinois' Corporate Policy as of January 2009 was submitted as an exhibit.  (Dkt 356, Ex. A.)  That document identifies "tipped positions" and "non-tipped positions," and lists the wage rates for the respective positions as of January 2009, noting that the Illinois minimum wage was then $7.75 per hour.  (*Id*. at A-04715.)  In that document, tipped positions are divided into "directly tipped": server (hire rate $4.65 per hour), bartender (hire rate $4.65 per hour), carside (hire rate $5.00 per hour); and "indirectly tipped": host/hostess (hire rate $4.35 per hour).  (*Id*.)  Non-tipped positions wage rates ranged from $7.75 for general utility ("GU") to $10.00 for service/kitchen professional. (*Id*.)

It is undisputed that, from at least October 2003 to the present, AppleIllinois paid servers, bartenders, hosts and carsides at an hourly "credit wage rate" that is less than minimum wage.  (Dkt 307 ¶ 37.)  Non-tipped employees are paid at least the minimum wage; in fact, expediters and kitchen staff make more than the minimum wage.  (Dkt 299, Ex. A, Dep. of Ronald Long at 101-02.)[6]

---

[6] For convenience, this opinion will refer to the "tipped credit rate" and the "minimum wage rate," recognizing that, as Long testified, the actual hourly rate for some AppleIllinois non-tipped workers is in excess of the minimum wage.

B.     *Position Descriptions*

AppleIllinois has written "Position Descriptions" for each of those positions, both tipped and

non-tipped.  (Dkt 299, Ex. P.)  These descriptions are AppleIllinois policy because they were adopted

from the franchisor.  (Dkt 299, Ex. J, Dep. of Scott Cortner at 166.)  For example, as primary

responsibilities, a GU employee (a non-tipped employee who receives minimum wage) "maintains

kitchen work areas, equipment, plateware and utensils in a clean, sanitary and orderly condition.

Assists in food preparation."  (Dkt 299, Ex. P at A-12240.)  The GU employee's "specific functions

and duties" are:

1.     Scrapes and pre-rinses food from dirty dishes and places them in dishwashing
       machine (50%).[7]
2.     Washes pots, pans and trays by hand and/or machine (15%).
3.     Completes all assigned prep work (10%).
4.     Removes trash and garbage to dumpster area (10%).
5.     Washes work area tables, walls, refrigerator equipment, cooking equipment
       and floors (5%).
6.     Cleans garbage cans and trash receptacles (5%).
7.     Assembles, maintains and breaks down dish machine (5%).

(*Id*.)

The expediter or "expo" is also a non-tipped, Back-of-the-House or "BOH" position, paid

at least at the minimum wage rate.[8]  The expo line or station is an area in the back of the house where

final food preparation is done.  The expediter reads tickets or orders on the kitchen display system,

pulls the items out, assembles them on a counter-top and arranges them for the servers to take out.

---

[7] The percentages refer to the "[a]pproximate percentage of total work time performing this
function." (*Id*.)

[8] "Front of the House" ("FOH") refers to the area of the restaurant to which diners have
access. Servers, hosts and bartenders are considered FOH employees. "Back of the House" ("BOH")
refers to the area of the restaurant where food and certain beverages are prepared, plated and placed
on trays for service to diners. The GU and Expo positions are BOH employees. (Dkt 319 ¶¶ 3-4.)

(Long dep. at 99-101.)  As described by AppleIllinois' Position Description, the expediter has the primary responsibility of "[c]oordination and consolidation for all outgoing food items from the kitchen assuring high standards of plate presentation and food quality." (Dkt 299, Ex. P at A-12239.) The "specific functions and duties" of an expeditor are:

1. Receive all incoming food orders (15%).
2. Clock in tickets and assure ticket cook times meet or exceed our standards (20%).
3. Communicate between the service staff and kitchen staff (5%).
4. Complete all plate presentations per the recipe/plate presentation specifications (30%).
5. Pass a final quality check on the food for plate presentation, temperature, garnish and time (5%).
6. Coordinate food delivery with food runners (20%).
7. Set up expediter station, keeping it clean, organized and stocked throughout the shift (5%).

(*Id.*)  It can take as long as 5 minutes to "expo" the order for a single table.  (*See, e.g.,* Decl. April Bodine ¶55; Decl. Kristen Burch ¶ 44 (server expediting own food takes 5-7 minutes each time).)

A server is a Front-of-the-House position, paid at the tip credit rate.  A server's primary responsibilities are "[t]o serve food, drinks, and to accommodate guests' needs in a courteous and timely manner following Applebee's Ten Basic Service Steps." (Dkt 299, Ex. P at A-12232.)  The "specific functions and duties" of a server are:

1. Delivers food and drinks to guests using Applebee's team delivery system (65%).
2. Greet guests, answers questions, makes suggestions regarding food, drinks and service (20%).
3. Interacts verbally with all guests creating a friendly and upbeat atmosphere (15%).
4. Relays orders to service bar and kitchen via the point of sale computerized register system (10%).
5. Observes guests and responds to any additional requests (10%).
6. Presents guest check to each table and accepts a form of payment. Makes correct change and/or completes the proper charge card procedure (10%).

7.    Participates in the clearing and resetting of dining room tables (10%).

(*Id*.)

C.    *Sidework lists*

In addition to the listed duties in the Position Descriptions, AppleIllinois' tipped employees are required to do "sidework" as reflected in various sidework lists.  (Dkt 307 ¶ 54.)  Plaintiffs contend that many of the sidework duties are tasks that would be performed by non-tipped employees paid minimum wage, but AppleIllinois required tipped employees to do them at the tipped credit rate.  (Pls.' Mem. at 4.)

AppleIllinois corporate executives drafted and distributed sidework lists to the restaurants. (Cortner dep. at 109.)  AppleIllinois has had different sidework lists over time.  (Dkt 307 ¶ 54; *see* dkt 299, Exs. Q ("pre-2008 sidework") and R ("post-2008 sidework").)  The pre-2008 sidework required tipped employees to do a number of BOH duties, including setting up the Expo Line, Salad/Dessert Station, Beverage Station, and side stations; preparing dressings, eggs, lemons, coffee and iced tea; cleaning all stainless steel in the back of the house; sweeping the GU floor on the server side; stocking cups, glassware, and ice bin; vacuuming aisles and ramps; taking apart and detailing the soda machine; keeping the Expo lines stocked; detailing the expo stainless; and rolling silverware.  (Dkt 307 ¶ 56; dkt 299, Ex. Q.)  AppleIllinois revised the sidework lists in 2008, but still retained many of those duties, including rolling silverware.  (Dkt 307 ¶ 58.)  According to Cortner, AppleIllinois revised the sidework lists after consultation with counsel to make them even more conservative than what AppleIllinois thought was permissible.  (Cortner dep. at 102-03.)

## III.     AppleIllinois' records of employee time

The employees' time is recorded on the POS (point-of-sale) system, as explained by Ronald Long, the CEO of AppleIllinois, and Scott Cortner, the vice-president of human relations. When an employee is hired, the manager of that restaurant inputs the data for that employee into the system. Employees are able to clock in only at the job codes the manager previously input for that employee. Although employees could potentially be assigned every job code, that's not how the system really works. In reality, if an employee is hired as a cook, that employee would be assigned a job code for "back of the house training" and a job code for cook. (Long dep. at 115-16; Cortner dep. at 62-63.) Tipped employees may also be given a code for "meeting time," which is paid at the minimum wage. (Cortner dep. at 63.)[9]

The POS system is capable of identifying what hours a person spent, for example, as a cook and what hours the person spent as a bartender. (*Id*. at 181-82.) Cortner testified that it is the company's policy that if someone is doing more than one job, for example, working as a bartender and is needed to cook, that the person clocks out of the bartender job code and clocks in as a cook. (*Id*. at 180-81.) The practice as described by AppleIllinois' payroll manager, however, is that for each *shift* an employee works at an Applebee's restaurant, the employee clocks in and out of the POS system, and enters the code for the position he or she will work during that shift. (Dkt 356, Ex.C-1, Decl. Candy Randall ¶ 4-5.) She says nothing about breaking out different positions during a single

---

[9]  Plaintiffs submitted certain deposition transcripts attached to their Local Rule 56.1 statement [dkt 299], and then supplemented (and in some cases overlapped) those transcripts with additional excerpts of those depositions attached to their response to AppleIllinois' Local Rule 56.1 (b)(3)(C) statement of additional facts [dkt 319] and their reply in further support of their summary judgment motion [dkt 318]. Depositions cited herein therefore may be found in various locations on the docket.

shift.

**IV.     AppleIllinois' policy on tipped employees doing duties of untipped positions.**

AppleIllinois produced as part of its wage policies a document entitled "Labor Management . . . Best Demonstrated Practices," dated August 13, 2007.  (Dkt 299-2, Ex. L; Dkt 307 ¶ 27.)  That document states, in part:

> BOH [Back of the House] savings are possible by utilizing FOH [Front of the House] Associates to complete some or all of the following:
>
> • Servers portion prep items during slow times.
> • All FOH Associates can act as the GU for slow shifts.
> • All FOH Associates can act as the Expo during slow times.
> • *When using FOH tipped, and or tipped shared associates to perform BOH functions be sure to have them time in using the appropriate job code.*  Utilizing these associates will allow you to not call in additional BOH associates to complete these functions, but at the same time you will be able to field a larger server crew if business levels increase later during the shift.

(*Id*. (emphasis added).)  According to AppleIllinois, this document means that FOH employees can perform certain BOH tasks under some circumstances.  "In other words, when a tipped employee is working in a non-tipped position, it is AppleIllinois' policy that the employee is clocked in under the job code that pays the employee the minimum wage rate as opposed to the tip credit rate."  (Defs.' Opp'n at 4.)  Interestingly, defendants Smith (president), Long (CEO) and Cortner (vice-president for human relations) testified they had not seen the "Best Demonstrated Practices" document before their depositions.  (Dkt 307 ¶¶ 11, 30.)

In November 2007, a year after this lawsuit and the *Fast* lawsuit were filed, the AppleIllinois Executive Committee notes reflect a conclusion that "[u]ntil clarification can be made, no tipp[ed]

employees will be doing dishes." (Dkt 307 ¶¶ 61-62.) However, AppleIllinois disputes plaintiffs' proposed statement of fact that it is AppleIllinois' policy that tipped employees are not to be performing any duties related to dishwashing or in the GU area. (*Id.* ¶ 63.) AppleIllinois responds, "There is no written AppleIllinois LLC policy regarding tipped employees performing duties related to washing dishes." (*Id.*)

Long testified that, although there are no written policies, "there are standards of operation and procedures." (Long dep. at 168.) Regarding dishwashing by servers, a server might, on a very busy shift, put a rack of glasses on the conveyer washing machine, but, he testified:

> [W]e've gotten pretty assertive about not letting tipped employees near the [dishwashing] machine. Does it still happen? Maybe. Where we are with it now, we don't want the tipped employees just doing anything with the dish machine. Now, is a server going to grab a stack of dirty pots or pans or plates and start scrubbing them and washing them? Not before and definitely not after this change in our policy would that have been acceptable.

(*Id*. at 168-69.) Most dishes can be washed by the machine, but larger and heavily soiled pans that are used for making sauces need to be done by hand. (*Id.* at 161.) Smith testified that, although he had not seen the sidework lists, he does not think that sidework includes doing dishes. Pots and pans, Smith said, should be done by kitchen staff. (Dkt 319, Ex. B, Dep. of Curtis Smith at 215-16.)

Cortner testified that AppleIllinois' policy, at least as of about 2008, is that "[a]ny tipped position cannot spend time back there doing dishes." (Cortner dep. at 99.) Servers can go back and push a rack of dishes into the machine for "less than a minute," but can't load the rack. (*Id*.) He believes that even before the change in 2008, tipped employees were not permitted to spend fifteen or twenty minutes washing dishes. (*Id.* at 100.) However, he acknowledged that the earlier sidework lists did permit dishwashing by tipped employees. (*Id.* at 128.) Requiring an employee to wash

15

dishes all day long, or even something less than a full shift, at a tipped credit rate would be unlawful, but he does not know what the "right" amount is. (*Id.* at 148.)

Regarding expediting, a person who is clocked in as an expediter makes more than minimum wage. (Long dep. at 236.) But expediters are not always scheduled, depending on volume. They are typically scheduled at the busiest times, probably right before lunch and dinner time. (*Id.* at 98; Cortner dep. at 167.) When an expediter isn't scheduled, servers expedite the food for their own customers. (Long dep. at 236; Cortner dep. at 167.)

The executives' testimony similarly reflects that, if an expediter is scheduled, the expediter sets up and takes down the expo line, but if none is scheduled, the tipped employees may be required to do it. Long testified that it is the duty of an expediter to set up the expediting area, but if an expediter is not scheduled, that job is done partially by servers and partially by line cooks, GU or the manager. (Long dep. at 98, 100.) Prior to 2008, he testified, if a server set up the expo station, the server would be paid at the minimum wage rate. (*Id.* at 103.) Cortner initially testified that if the expediter isn't scheduled, setting up the expo station is the duty of a BOH employee paid at least minimum wage. (Cortner dep. at 168-69.) On further questioning he said he is aware that during daytime opening procedures, other employees (servers, hosts or bartenders) who are not BOH set up the expo line. The policy is that tipped employees can help set up the expo line if no expediter is scheduled. (*Id.* at 255-57.)

Regarding general cleaning, Long testified that tipped employees "never" mop the floors or clean the bathrooms. (Long dep. at 162.) "As I defined it, sweeping and mopping the floors and scrubbing the urinals, I have never known a tipped employee to do that type of cleaning." (*Id.* at 163.) He testified that it has "always" been the company policy that tipped employees should not

be cleaning the urinals, scrubbing the floors, and sweeping in the bathroom. (*Id*.) While servers might do some routine feather dusting of decorative artifacts, they would not typically wipe down the walls with Pledge; that "would be something that a GU or a line cook would do." (*Id*. at 164.)

Cortner testified similarly. Tipped employees, he said, were not asked to mop and clean floors or clean bathrooms, although they may clean their work station and check the condition of the bathroom. Cleaning floors and bathrooms are tasks for a person paid at least minimum wage. (Cortner dep. at 104-05.)

Corporate meeting minutes reflect a calculation made in 1999 that, based on Chicago Applebee's information, Florida restaurants could save $70,000 per year by discontinuing third-party cleaning crews and performing all restaurant cleaning with restaurant employees. (Dkt 307 ¶ 32; dkt 299, Ex. M at 4.) That would include *servers* spending 45 minutes daily vacuuming; 30 minutes daily spent by prep cooks, GU workers *or hosts* cleaning bathrooms ("[i]ncludes fixtures, toilets, urinals, and mirrors"); and 45 minutes daily spent by *servers or hosts* cleaning all brass. (Dkt 229, Ex. M at 4 (emphasis added).)

## V.    **Declarations of employees**.

The declarations of current and former AppleIllinois employees that were resubmitted on this motion collectively create a picture of the actual duties AppleIllinois' tipped employees have been required to perform. Plaintiffs refiled 42 declarations of former employees. [Dkt 299, Ex. U.] Plaintiffs and AppleIllinois collectively refiled another 61 declarations of employees who were at the time of their declarations employed by AppleIllinois (referred to herein as the "current employees"). [Dkt 299, Ex. T; dkt 310, Exs. E-I.]

17

The vast majority of the declarations came from people who work or worked in tipped occupations (directly or indirectly) for AppleIllinois, while a handful of declarations were provided by various restaurant managers. The former employees gave general descriptions of performing a great deal of work in addition to customer service duties, while the current tipped employees provided more detail: describing their shift lengths and frequency, the tasks routinely and occasionally assigned to them, and the approximate time it takes to complete those assignments.

The declarations contain considerable variety, certainly enough to convey individual experiences rather than *pro forma* recitations by attorneys, and describe employees' experiences at many of the restaurant locations. The declarations, especially those provided by AppleIllinois, demonstrate that AppleIllinois' tipped employees perform a range of duties in addition to greeting and serving customers, and that across shifts and restaurant locations they spend a good portion of their time performing such other duties. Taken together, the declarations are evidence supporting the analysis set out below.

A. *Tipped employees' shifts*

Notably, the majority of the current AppleIllinois employees describe regular shifts of less than eight hours. (*See* dkt 299, Ex. T.) Many employees at various locations describe shifts of about four hours long, while some describe shifts as short as an hour or two, while only a few describe eight to 10 hour shifts. (*See, e.g.,* Decl. John Dispensa (one to four hour server shifts); Decl. Amanda Hamilton (two to four hour server shifts); Decl. Ora Henderson (seven hour server shifts); Decl. Diana Ducat (seven to eight hour server shifts); Decl. Shannon Behric (six to seven hour server shifts); Decl. Michelle Rich (four hour host shifts); Decl. Beth Sodt (one to five-and-a-half hour

18

server shifts).)  Bartenders at various locations tend to report longer shifts than servers or hosts. (*See, e.g.,* Decl. Christopher Cruz (six to eight hour bartender shifts); Decl. Kristine Hollis (three to five hour host shifts, three-and-a-half hour server shifts, six-and-a-half hour bartender shifts); Decl. Tiffany Kirchner (four to six hour server shifts, eight hour bartender shifts); Decl. Brent Perrotti (three to four hour server shifts, six hour bartender shifts).)

The declarations depict work at AppleIllinois as generally divided into three shifts: opening, middle, and closing.  Most shifts in most locations, in turn, have opening duties, running sidework duties (to be performed throughout the shift), and closing duties, in addition to interacting with and serving customers.  The vast majority of the current tipped employees describe in some detail the duties they are assigned during their shifts, and although the amount of time and specific assignments vary, their general descriptions are fairly consistent.

Several employees report that, as hosts or servers, they began their shift with opening duties anywhere from half-an-hour to an hour before the restaurant opens at 11:00 a.m.  (*See, e.g.,* Decl. Patricia Rozanski ¶ 27; Decl. Amanda Hamilton ¶ 27; Decl. Ronald Hauswald ¶ 29; Decl. Kristine Hollis ¶ 35; Decl. Brittany Lindstrom ¶ 27.)[10]  Host Omar Qahhaar described performing opening duties two hours before the Crestwood Applebee's restaurant opened.  (Decl. Omar Qahhaar ¶¶ 3, 25.)  Many employees report performing at least some opening duties while simultaneously serving customers.  (*See, e.g.*, Decl. Alexandra Dewbray ¶ 28; Decl. Kaylee Halberg ¶ 32.)  Some also report performing closing duties while simultaneously serving customers.  (*See, e.g.*, Decl. Amy Mann ¶

---

[10]  Several other employees' declarations also suggest they arrived half-an-hour to an hour before the restaurant opened because they came in at 10:00 or 10:30 a.m.  (Decl. Heidi Bennigen ¶ 25; Decl. Justin Harris ¶ 23; Decl. Joann Macam ¶ 34.)

29; Decl. Beth Sodt ¶¶ 28, 32; Decl. Chase Stuebner ¶ 31.)

B.    *A current server's declaration*

A detailed review of one server's declaration – one that was originally submitted by AppleIllinois in its opposition to class certification – provides insight into how AppleIllinois restaurants actually function.  Heidi Bennigen worked as a server from April 2008 through at least the date of her declaration, April 10, 2009, at the Geneva Applebee's restaurant.  (Decl. Heidi Bennigen ¶ 3.)  She works opening, middle and closing five-hour shifts, and she says that during each shift there were other employees also working, including hosts to seat customers, bartenders to make drinks and serve customers in the bar area, dishwashers to wash dishes, cooks to cook food, managers to oversee and assist with all operations, carside employees to handle carside orders, and "expo" employees to dress the plates and take finished orders from the cooks.  (*Id*. ¶¶ 4, 21, 24.)  General utility ("GU") employees to handle back of the house duties, however, were scheduled on Wednesdays through Sundays.  (*Id*. ¶ 24.)  Her declaration does not state who handled GU work on Monday and Tuesday, but the description of her work suggests that some of what would otherwise be GU work was handled by servers like Ms. Bennigen.  (*See id.* ¶ 34.)

When working as a server during the opening shift assigned to the front of the house, Ms. Bennigen's "opening sidework" consists of making sure the front of the house is clean and the tables are stocked with condiments.  (*Id*. ¶ 26.)  When assigned to the back of the house, she makes coffee and iced tea (5 minutes), sets up dressings and ensures nothing has expired (30-60 minutes "depending on if the closers had replaced the dressings properly"), and previously also cut lemons (5 minutes).  (*Id*. ¶ 27.)  As running sidework, she checks other people's sidework during the shift

and keeps her tables clean.  (*Id*. ¶ 28.)

When assigned to close the front of the house during the opening shift, Ms. Bennigen checks the other servers' tables (2 minutes per server for 6-7 servers), stocks condiment caddies, and cleans her assigned section by sweeping under tables and wiping down tables and chairs (15 minutes).  (*Id*. ¶ 29.)  When assigned to close the back of the house, she checks other servers' sidework (side station and expo line) (2-3 minutes per server for 6-7 servers) and completes any sidework left unfinished by other servers.  (*Id.* ¶ 30.)  Ms. Bennigen concludes that performing all opening shift sidework tasks take approximately 45-60 minutes of opening and closing sidework, and fifteen minutes per hour of running sidework.  (*Id*. ¶ 32.)

During the middle shift, Ms. Bennigen begins with performing a 10 point station check (5 minutes) and checks her assigned sidework for the day (2 minutes).  (*Id*. ¶ 33.)  Assigned sidework tasks throughout the shift might include keeping dressings filled, filling the expo line (toppings), taking out the trash, stocking condiments, boxes, napkins and cups at the side station, or stocking the beverage station.  (*Id.* ¶ 34.)  To close her middle shift, Ms. Bennigen rolls silverware (10-15 minutes), completes assigned sidework (15 minutes or so), and cleans her section (15-20 minutes).  (*Id*. ¶ 35.)  She concludes that performing all middle shift sidework tasks take no more than 47-67 minutes of opening and closing sidework, and less than 5 minutes per hour of running sidework.  (*Id*. ¶37.)

When working as a server during the closing shift, Ms. Bennigen checks her tables before beginning her shift (10 minutes), and is not typically assigned any running sidework.  (*Id*. ¶¶ 38, 39.)  When assigned to close the front of the house during the closing shift, she checks the other servers' tables, (2 minutes for each of 5 to 9 servers), vacuums the aisles (depending on how well the servers

swept) (10 minutes, when needed), mops around the bar area (7 minutes), and cleans the bathroom by mopping the floor, cleaning the mirrors and taking out the trash (15 minutes). (*Id*. ¶ 40.) When assigned to close the back of the house during the closing shift, she checks the other servers' sidework (2-3 minutes per 5 to 9 servers) and finishes any sidework that needs to be done (10 minutes). (*Id.* ¶ 41.) She often begins performing closing sidework duties while simultaneously serving customers. (*Id.* ¶ 42.) Ms. Bennigen estimates that, depending on her assigned tasks during the closing shift, she spends 25 to 55 minutes performing opening, running, and closing sidework duties. (*Id.* ¶ 43.)

In her declaration, therefore, Ms. Bennigen itemizes *52 to 99 minutes* spent on opening, running and closing sidework duties during her typical five hour (or 300 minute) opening shift. (*Id.* ¶¶ 26-30.) She estimates the total slightly differently: stating that she spends 45 to 75 minutes on opening and closing duties and 15 minutes *per hour* on running sidework. (*Id.* ¶ 32.) Regarding her typical five hour middle shift, she itemizes 47 to 57 minutes on opening, running and closing work, but again estimates the grand total a bit differently: she concludes that she spends 47 to 67 minutes on opening and closing duties plus five minutes *per hour* on running sidework. (*Id.* ¶¶ 33-37.) Lastly, she itemizes 30 to 58 minutes of such work during the closing shift, but she concludes that she spends 25 to 55 minutes on closing shift opening and closing sidework and no time on running sidework. (*Id.* ¶¶ 38-43.) In any event, according to Ms. Bennigen, a good portion of her usual five hour – or 300 minute – shifts is devoted to opening, running, and closing sidework, including mopping floors and cleaning bathrooms.

In addition, however, every other week Ms. Bennigen also cleans the chandeliers in her section (5 minutes), wipes down the wood paneling in her section (10 minutes), cleans the windows

in her section (10 minutes) and dusts the artifacts and wood blinds (10 minutes).  (*Id*. ¶¶ 46, 50-52.)

She also loads and pushes silverware through the dishwasher daily (2-3 minutes), occasionally expos

food (15 minutes per shift when there is no specific person performing expo duties), and although

she is occasionally assigned to take out the garbage, she usually arranges for someone else to do it

for her.  (*Id*. ¶¶ 47, 49, 53.)


C.      *Other servers' general cleaning and other duties*

While not all servers reported performing all of the additional duties Ms. Bennigen lists,

many specified general cleaning duties in addition to those duties dubbed opening, running and

closing sidework.  (*See, e.g*., Decl. Justin Harris ¶ 43; Decl. Ronald Hauswald ¶¶ 58, 62; Decl. Joann

Macam ¶¶ 55, 58; Decl. Meghan Quinlin ¶¶ 44-47).  Crystal Lake server Meghan Quinlin cleans the

chandeliers, dusts the pictures and applies lemon oil to the woodwork in her section every week.

(Decl. Meghan Quinlin ¶¶ 3, 44-47.)  Palatine server Amanda Hamilton explained that in addition

to the minimum 30 minutes she spends performing opening, running and closing duties during her

typical two to four hour shift, she cleans the lamps and wipes down the wood in her section weekly,

and she vacuums the front of the house when assigned to close the dinner shift.  (Decl. Amanda

Hamilton ¶¶ 4, 30-51, 54, 55, 58.)  When working as a server at the Aurora location, Kristine Hollis

also wipes down wood paneling weekly in addition to dusting artifacts on the walls.  (Decl. Kristine

Hollis ¶¶ 3, 5, 6, 43, 45.)  As a server at the Ford City location, Nicole Frazier has never cleaned the

wood paneling, but she cleans the chandeliers once a week, vacuums her section when dirty and puts

glasses in the GU machine about once a month.  (Decl. Nicole Frazier ¶¶ 3, 47-49.)  Addison server

Michael Wruck cleans the chandeliers at the beginning of each of his two to three-hour shifts.  (Decl.

Michael Wruck ¶ 3, 4, 34.) Zion server Justin Harris explained that at his location servers are assigned a "daily task" to perform in their sections throughout the shift, such as cleaning the wood paneling or dusting the artifacts. (Decl. Justin Harris ¶ 43.) John Manuel, Ginger Carrillo and Brittany Folmer similarly describe servers' daily cleaning tasks at the Arlington Heights, Tinley Park and Addison locations. (Decl. John Manuel ¶¶ 3, 28; Decl. Ginger Carrillo ¶¶ 3, 22; Decl. Brittany Folmer ¶¶ 3, 45, 46.)

Likewise, many servers reported spending regular amounts of time performing other tasks for general restaurant operations. Mokena server Kristen Burch spends five to 30 minutes rolling silverware every day. (Decl. Kristen Burch ¶ 29.) Geneva server Nicholas Flanagan spends 15 minutes per day rolling silverware. (Decl. Nicholas Flanagan ¶¶ 3, 51.) Others reported silverware rolling assignments with each shift. (*See, e.g.*, Decl. Agusto Jiminez ¶¶ 4, 41 (10 minutes per four to seven-hour shift); Ginnie Cutro ¶¶ 4, 29, 41 (between five to 25 minutes per two to five hour shift); Michael Wruck ¶ 36 (15 minutes per two to three-hour shift).)

### D. *Current bartenders' declarations*

Brent Perrotti, a current employee at the Mundelein Applebee's who works both as a server and a bartender, provides a picture of a bartender's tasks. Mr. Perrotti typically works six-hour shifts as a bartender. (Decl. Brent Perrotti ¶ 4.) Mr. Perrotti begins an opening shift by pulling down the bar stools, placing beer in the cooler, setting up the four-sink system, taking off cone cups, rolling out mats, filling ice, stocking back wine and juices and filling out the bar checklist. (*Id.* ¶ 73.) Previously, he also cut fruit as an opening duty, but by the time of his declaration that task had changed to an as-needed one. (*Id.*) Although not entirely clear from his declaration, it appears that

until late 2006 he began opening shift bartender duties an hour before the restaurant opened, and was then beginning his shift a half-hour before it opened. (*Id*. ¶ 72.) He notes sometimes completing opening duties while simultaneously serving customers at the bar. (*Id*. ¶ 74.) Although he used to restock the bar as necessary during an opening shift (15 minutes), he no longer performs that task or any other running sidework. (*Id*. ¶ 75.) To close the opening shift, Mr. Perrotti refills ice and stocks backups, tasks he often begins while simultaneously serving customers at the bar. (*Id*. ¶¶ 76-77.) Mr. Perrotti estimates that during the opening shift he spends 65-70 minutes performing opening and closing sidework and almost no running sidework. (*Id*. ¶ 78.)

As a middle shift bartender, Mr. Perrotti performs no opening sidework, and although he cleans the glasses, refills ice and stocks backups as needed, he performs little other running sidework. (*Id*. ¶¶ 79-81.) Although he doesn't specify his closing duties, he estimates that he spends no more than 10-15 minutes on closing sidework tasks, and that he often begins such work while simultaneously serving customers at the bar. (*Id*. ¶¶ 82-83.)

As a closing shift bartender, Mr. Perrotti performs no opening sidework and nearly no running sidework. (*Id*. ¶¶ 84-85.) To close the shift, he puts beer into the cooler, throws out fruit, brings containers to the GU, scrubs the floor with a brush and squeegee, puts seats up and puts cone cups on liquor bottles. (*Id*. ¶ 86.) He estimates that he spends approximately 60-80 minutes performing closing sidework tasks, although he often begins completing his tasks while simultaneously serving customers at the bar. (*Id*. ¶¶ 87-88.) In addition to his routine sidework, Mr. Perrotti wipes down wood paneling on the bar about once a month, occasionally expedites food, and at one time regularly processed carside orders. (*Id*. ¶¶ 91-94.)

Like Mr. Perrotti, other bartenders described regularly assigned cleaning tasks in addition to

their opening, running and closing sidework.  (*E.g.*, Decl. Shannon Behric ¶¶ 64, 65 (5 to 15 minutes per week applying oil to wood around bar; one to two minutes taking out trash during closing shift); Decl. Christopher Cruz ¶¶ 48, 49 (10 minutes per week wiping down wood; 15 minutes per week cleaning cooler behind bar); Decl. Kristine Hollis ¶ 66 (10 minutes per week wiping down wood paneling); Decl. Patricia Rozanski ¶¶ 84, 85 (10 minutes per week cleaning bar area coolers; occasionally dusting wood paneling around bar).)  According to Bloomingdale bartender Chase Stuebner, different *daily duties* assigned to bartenders include cleaning out a cooler, polishing brass or mopping the liquor cooler, "depending on the day."  (Decl. Chase Stuebner ¶¶ 3, 28.)  He estimates spending 10 to 40 minutes of his six to seven hour shift on such work, in addition to his opening, running and closing sidework tasks.  (*Id*. ¶¶ 4, 28.)

E.      *Current hosts' declarations*

Ora Henderson described her duties as a host at the Homewood location, where she typically works seven hour shifts from 10:00 a.m. to 5:00 p.m.  (Decl. Ora Henderson ¶¶ 3, 4.)  Ms. Henderson starts her opening shift by getting towels (less than one minute), *picking up debris in the parking lot* (15 to 25 minutes), *cleaning the bathrooms* (10 minutes), wiping down tables (10 minutes), wiping down high chairs and boosters (five to seven minutes), dusting the artifacts in the foyer (two to three minutes), and turning on the televisions (one minute).  (*Id*. ¶ 24.)  She estimates that she spends approximately 60 minutes per shift on opening sidework.  (*Id*. ¶ 28.)

Ms. Henderson's running sidework duties include checking the bathrooms, wiping down menus and sweeping the floor when necessary.  (*Id*. ¶ 25.)  Although she doesn't specify how much time she devotes to each of these tasks, she estimates that she spends up to five minutes per hour

performing all of them. (*Id*. ¶ 28.) Her opening shift closing sidework involves checking the bathrooms (2 to 3 minutes), wiping down and straightening the menus (2 to 3 minutes), wiping down the foyer windows and door (2 to 5 minutes) and making sure that the host station is fully stocked with toothpicks and crayons (1 to 2 minutes). (*Id*. ¶ 26.) She says that she is often able to complete her closing sidework while simultaneously seating customers. (*Id*. ¶ 27.) She concludes that she spends no more than 11 minutes performing all of her closing sidework tasks. (*Id*. ¶ 28.)

In total, then, Ms. Henderson estimates that she devotes approximately 71 minutes on opening and closing sidework, and up to five minutes per hour on running sidework. (*Id*.) Her estimates total up to *106 minutes of her usual seven hour, or 420 minute shift*. In addition, however, Ms. Henderson spends one or two minutes at the end of each shift taking the host station waste basket to the Back of the House, five minutes weekly wiping down the wood paneling in the foyer area, and one to two minutes when necessary wiping down the windows in the host area. (*Id.* ¶ 30.)

Other hosts at other locations provided similar descriptions of their work. When working as a Crystal City host, Guadalupe Ibarra checks and restocks the bathrooms and wipes down the high chairs in addition to other opening shift host sidework tasks, and she re-checks the bathrooms hourly. (Decl. Guadalupe Ibarra ¶ 49.) Elle Liberty also checks the bathrooms and wipes down tables when she starts her opening host shift in Mokena, in addition to putting down mats and *picking up debris from the restaurant's parking lot*, among other things. (Decl. Elle Liberty ¶ 41.) When Kristine Hollis worked as a host in Aurora, she also checked and stocked the bathrooms and occasionally *cleaned bathroom surfaces* in addition to regularly wiping down entryway windows and wood paneling at the host section. (Decl. Kristine Hollis ¶¶ 69, 71, 75.) Ms. Hollis also occasionally rolled silverware for up to 30 minutes when the restaurant was busy and needed silverware. (*Id.* ¶

76.) Omar Qahhaar starts his opening host shift in Crestwood *two hours before the restaurant opens* by mopping the bar, foyer and bathrooms in addition to *cleaning the bathroom toilets, mirrors, sinks and urinals*, stocking children's menus, straightening the host stand and wiping down tables. (Decl. Omar Qahhaar ¶¶ 3, 25, 26.)

It is important to recall that the declarations just summarized were submitted by *AppleIllinois* and are the testimony of employees who were then employed by AppleIllinois. Those declarations are remarkably consistent with the declarations of former employees that plaintiffs submitted.

F.      *Former employees' declarations regarding assigned cleaning duties*

The former employees similarly report that additional tasks had regularly been assigned to them as servers, bartenders and hosts. Kendra Buss and Jennifer Swords described "daily cleaning duties" that were assigned to servers at the Geneva and Peru Applebee's restaurants respectively, including tasks like cleaning wood paneling, dusting and washing window blinds and scrubbing walls in the kitchen. (Decl. Kendra Buss ¶¶ 1, 3; Decl. Jennifer Swords ¶¶ 1, 3-4.) According to Deborah Cavaliere, regular cleaning tasks were assigned to servers at the Elgin Applebee's restaurants such that the entire restaurant was cleaned over the course of each week. (Decl. Deborah Cavaliere ¶ 3.) Other former employees likewise stated that servers washed dishes, cleaned restrooms, swept, vacuumed and performed general cleaning of the restaurant. (*See, e.g.,* Decl. Brian Cooper ¶¶ 3, 5; Decl. Tracy Thennes ¶ 3; Decl. Sarah Whitford ¶ 3.) Sarah Whitford noted that as a server at the Calumet City Applebee's restaurant, it was not uncommon for her to spend at least *two hours* during the weekend cleaning the restaurant. (Decl. Sarah Whitford ¶¶ 1, 4.)

G.    *Tipped employees doing GU and expo work in the absence of those workers*

In addition, former employees state that they performed additional duties during their shifts as a result of restaurants not being fully staffed.  Glenn Driver (a named plaintiff) explained that when the Ford City Mall location opened for business in June 2006, the restaurant had a full staff, including dishwashers, or "GU," and expo personnel.  (Decl. Glenn Driver ¶¶ 1, 3, 4.)  After a few weeks, however, as the high level managers who supervised the opening left, the restaurant began to schedule GU and expo employees less frequently, and as their schedules dropped, their duties were shifted to servers, hosts and bartenders.  (*Id.* ¶ 5.)  Demiko McCaster (a named plaintiff) provided the same description.  (Decl. Demiko McCaster ¶¶ 1, 4, 5.)  In addition to his bartender duties, Mr. McCaster explained, when the GU employees were no longer being scheduled, he was tasked with taking up rubber floor mats and running them through the dishwasher and mopping the floor in the bar area, work the GU employees otherwise would perform.  (*Id.* ¶ 6.)  Likewise, Michael Hicks (Ford City), Michael Anaballi (Elgin, Decatur, and Lake in the Hills), Angelique Bernales (Grand Avenue, Chicago) and Michele Boeche (Schaumburg), among others, described servers performing expo duties when the expo personnel were not scheduled.  (Decl. Michael Hicks ¶¶ 1, 6; Decl. Michael Anaballi ¶¶ 1, 3; Decl. Angelique Bernales ¶¶ 1, 6; Decl. Michele Boeche ¶¶ 1, 6.)

Notably, many current employees also stated that GU and expo employees were only scheduled part of the time.  (*See, e.g.,* Decl. Kaylee Halberg ¶ 29 (GU only nights and weekends in Peru); Decl. Kristine Hollis ¶ 34 (GU only weekends in Aurora); Decl. Laura Krupienski ¶ 24 (expo only evenings in Schaumburg); Decl. Joann Macam ¶ 33 (expo only evenings in Arlington Heights); Decl. Patricia Rozanski ¶ 25 (GU only evenings in Palatine); Decl. Beth Sodt ¶ 25 (expo only evenings in Geneva).)  Some servers specifically noted doing expo tasks when employees staffed in

those roles were not scheduled.  (*See, e.g.*, Decl. Brittany Lindstrom ¶¶ 26, 55; Decl. Joann Macam ¶¶ 33, 54.)  In some instances, declarants noted that cooks or managers assisted with certain GU or expo duties, but many did not note such assistance.

## VI.    Pay rates.

### A.    *Named Plaintiffs*

All five named plaintiffs state that they were paid less than minimum wage for their work at AppleIllinois restaurants regardless of the work they were required to do.  (*See* Driver Decl. ¶ 2; McCaster Decl. ¶ 2; Decl. Rosamar Mallari ¶ 2; Decl. Joyce Britton ¶ 2; Decl. Michael Hicks ¶ 2.)

### B.    *Plaintiffs' analysis of payroll records*

AppleIllinois produced payroll records in discovery, some in a database format.  Plaintiffs' counsel reviewed the database for the payroll records of all of the 95 current employees whose declarations were submitted by AppleIllinois in its opposition to the original class certification motion.  (Dkt 299, Ex. O, Decl. David Stevens.)  After removing eight salaried managers and two other declarants whose payroll information did not appear in the database, plaintiffs' counsel analyzed the records of the remaining 85 employees for the period from October 6, 2003 (the start of the class period) through June 2, 2009 (the date the declarations were filed).  (*Id.*)

With the exception of a few declarants who worked at times in non-tipped positions, and the time that the employees were paid minimum wage during training, in nearly all instances the hourly rate for the 85 individuals was less than the minimum wage.  (Dkt 299, Ex. O ¶¶ 16-18.) AppleIllinois presented no evidence contrary to that conclusion.

C.    *AppleIllinois' analysis of payroll records*

The analysis done by AppleIllinois' Payroll Manager, Candy Randall, leads to a similar conclusion. (*See* dkt 310, Ex. C, Decl. Candy Randall (that document was also submitted in opposition to the motion for class certification, dkt 212).) Randall examined payroll records for the two weeks at the end of December and beginning of January for each of four years (2004-2005; 2005-2006; 2007-2008; and 2008-2009). (Randall Decl. ¶¶ 9-18.) She listed each of the employees who recorded time during those periods at both tipped and non-tipped rates. (Dkt 212, Randall Decl., Exs. A-E.)[11]  The court has cross-checked the names listed on the exhibits against the 95 declarations submitted AppleIllinois in opposition to class certification. Only 18 of the 95 current employees who signed declarations had any time listed at the minimum wage rate.[12]  For example, the records submitted by AppleIllinois do not show that Ms. Bennigen was ever paid at anything other than the tip credit rate for all of the work she did, including mopping the bathroom floors and cleaning windows.

---

[11]  The version of Randall's declaration filed as dkt 310, Ex. C, does not include the spreadsheets in Exhibits A to E, but they are filed as part of dkt 212, and the court's courtesy copy indicates that they are the same exhibits.

[12]  Those are Brian Ackermann, Christopher Artuz, Shannon Behric, Carleen Cavanaugh, Ginnie Cutro, Danielle Dimaso, John Dispensa, Sarah Dyer, Kaylee Halberg, Desiree Hall, Ora Henderson, Kristine Hollis, Amy Mann, Emmanuel Ortiz, Brent Perrotti, Omar Quahhaar, Meghan Quinlin, and Nicole Rataschak.  For example, Omar Quahhaar recorded time as a host ($4.65 per hour), an expo worker ($8 per hour) and a line cook ($8.50 per hour).  (Randall Decl, Ex. E at 7.) The duties he described in his declaration, however, such as arriving two hours before the restaurant opened and cleaning bathrooms, were, he stated, part of his duties as host.  (Quahhaar Decl. ¶¶ 25, 26.)  Thus, presumably he was paid at the host (tip credit) rate for that time.

# LEGAL STANDARD

## I.     Summary judgment standard

"Summary judgment is appropriate if the admissible evidence considered as a whole shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,' Fed. R. Civ. P. 56(a), even after all reasonable inferences are drawn in the nonmovant's favor." *Dynegy Mktg. & Trade v. Multiut Corp*., 648 F.3d 506, 517 (7th Cir. 2011). To successfully oppose a motion for summary judgment, the responding party may not simply rest on its pleadings, but rather must submit evidentiary materials showing that a material fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine dispute of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining whether a genuine dispute of material fact exists, the court construes all facts and draws all reasonable and justifiable inferences in favor of the nonmoving party. *Id.* at 255.

Cross-motions for summary judgment do not, of course, waive the right to a trial. *Marcatante v. City of Chicago*, 657 F.3d 433, 438-39 (7th Cir. 2011). Rather, on cross-motions for summary judgment, the same standard of review in Rule 56 is applied to each motion to determine whether there is a genuine dispute of material fact and whether judgment should be entered as a matter of law. *Id.*; *Contl. Cas. Co. v. N.W. Natl. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). In ruling on each cross motion for summary judgment, the court draws inferences in favor of the party against whom the motion under consideration is made. *Siliven v. Indiana Dept. of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011).

## II.     Burden of proof

Plaintiffs contend that AppleIllinois bears the burden of proving its entitlement to take the tip credit.  (Pls.' Mem. at 6.)  AppleIllinois does not discuss the burden of proof except to cite the *Fast* case.  (Defs.' Opp'n at 12.)

In support of their position, plaintiffs cite *Auer v. Robbins*, 519 U.S. 452, 462 (1997), for the proposition that an employer who raises an exception to the minimum wage provisions of the FLSA has the burden of proving entitlement.  (Pls.' Mem. at 6.)  *Auer*, however, dealt with an *exemption* to the FLSA, and it is well established that the employer bears the burden of proving its entitlement to such an exemption.  *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974); *Demos v. City of Indianapolis*, 302 F.3d 698, 701 (7th Cir. 2002).  The tip credit provision, however, is not found among the FLSA's listed "exemptions" (*see* 29 U.S.C. § 213), but rather arises out of the FLSA definitions and related regulations (*see* 29 U.S.C. § 203(m); 29 C.F.R. § 531.59).

Recently, the Seventh Circuit observed that another FLSA definition, 29 U.S.C. § 203(o) (excluding washing and clothes-changing time from coverage under the statute), creates an "exclusion," not an "exemption," under the Act because "exemptions" appear in Section 213, not Section 203.  *Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 595 (7th Cir. 2012).  Applying that analysis, the tip credit provision may also be considered an exclusion, rather than an exemption, under the FLSA.  The IMWL, on the other hand, specifically describes an employer's tip credit allowance as "a claim of exemption" (820 Ill. Comp. Stat. § 105/4(c)), suggesting that under the IMWL, the employer bears the burden to demonstrate a right to take that allowance.  *See Richardson Bros. v. Bd. of Rev. of Dept. of Empl. Sec.*, 555  N.E.2d 1126, 1128 (Ill. App. 5th Dist. 1990) (holding that

the burden of proving an exemption from the IMWL is on the employer).

The DOL, while noting that the tip credit is not an exemption, interprets the FLSA as requiring the employer to bear the burden of complying with the minimum wage law.

> Section 3(m) of FLSA makes clear the intent of Congress to place *on the employer* the burden of proving the amount of tips received by "tipped employees", and the amount of tip credit, if any, which the employer may claim. Since Sec 3 (m) is not an exemption from the MW [minimum wage], but merely allows the employer to claim up to 40 percent of the MW as tip credit, the employer is responsible for ascertaining that the MW provisions are complied with in compensating "tipped employees."

U.S. Dept. of Labor Field Operations Handbook Ch. 30d00(b) (Rev. 563) (Dec. 9, 1988) (emphasis in original) (*available at* http://www.dol.gov) (last visited Aug. 24, 2012). The DOL's interpretation of the statute it is charged with enforcing is not controlling, but it is persuasive authority here. *See Gonzales v. Oregon,* 546 U.S. 243, 255-56 (2006); *Urnikis-Negro v. Am. Fam. Prop. Servs.*, 616 F.3d 665, 676 (7th Cir. 2010); *Fast,* 638 F.3d at 878.

In an FLSA claim, "an employee who brings suit . . . for unpaid minimum wages . . . has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946) (superseded by statute on other grounds).

> [A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. . . . The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negat[e] the reasonableness of the inference to be drawn form the employee's evidence.

*Id*. at 687.

Applying the *Mt. Clemens* standard in a situation very much like this, the Eighth Circuit

concluded:

> [T]he employees here must establish that they spent a substantial amount of time performing nontip-producing duties such that they were not performing a tipped occupation for at least portions of their shifts. If Applebee's did not maintain sufficient records from which the employees can differentiate between when they performed tipped duties and when they performed related but nontip-producing duties within the meaning of the dual jobs regulation, then the employees can use the relaxed Mt. Clemens standard by "produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."

*Fast,* 638 F.3d at 882 (citation omitted).

Since it is undisputed that, with few exceptions, AppleIllinois paid plaintiffs at the tip credit rate for their work, the IMWL's classification of the tip credit allowance as an exemption might lead to a conclusion that AppleIllinois should be required to demonstrate that its employees did *not* work in dual jobs. However, this court will follow the *Fast* case's guidance and apply a standard that is less favorable to plaintiffs. Plaintiffs will have the burden of showing that they were not performing their tipped occupations for at least a portion of their shift.[13]

## ANALYSIS

AppleIllinois stresses that "context is extremely important." (Defs.' Opp'n at 13.) That is true for this opinion as well. The court is not undertaking, as AppleIllinois fears, a "radical

---

[13] If plaintiffs establish that proposition, the burden is on AppleIllinois to show that it maintained records pursuant to 29 C.F.R. § 516.28(a) that show how many hours in each workday its employees worked in tipped and non-tipped occupations and that it paid at least the minimum wage for hours worked in the non-tipped occupations. AppleIllinois' contention that plaintiffs bear the burden of showing the amount of time they worked in the positions for which they claim they were entitled to the minimum wage (Defs.' Opp'n at 12) is contrary to *Mt. Clemens* and the requirement of 29 C.F.R.§ 516.28(a), and is not a correct reading of the *Fast* opinion. *See Fast*, 638 F.3d at 882.

deconstruction of basic restaurant occupations" (*id.* at 1), but rather deciding whether the named plaintiffs and the plaintiff class here are entitled to summary judgment on the claims that their employer, AppleIllinois, violated the IMWL and the FLSA by failing to pay them required minimum wages, or whether, on the other hand, AppleIllinois is entitled to a judgment that plaintiffs have no claim under those statutes. After a careful review of the evidence, including reviewing *each* of the employees' declarations submitted, the court concludes that plaintiffs are entitled to judgment as a matter of law on the issue of liability.

## I.     Conclusions from declarations and payroll records.

Neither party argues that there is a genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a). The evidence supports the conclusion, which AppleIllinois does not dispute, that "[t]ipped employees performed the duties of dishwashing, expediting food, Expo line set up and other BOH duties, and general restaurant cleaning, while paid a tip credit rate." (Dkt 307 ¶ 65.)

Even drawing all reasonable inferences favorable to AppleIllinois for purposes of plaintiffs' motion, the evidence demonstrates that AppleIllinois employees working at tip credit rates did those duties for much longer periods of time than can be fairly characterized as occasional, incidental or insignificant. Rather, employees working at tip credit rates were regularly used instead of minimum wage workers to do those tasks. The evidence also demonstrates that using tipped employees to do those duties was not an isolated, rare, or random occurrence, but rather the general practice at AppleIllinois restaurants across the various locations and throughout the class period. That resulted from sidework lists generated by AppleIllinois' corporate offices, and the fact that AppleIllinois permitted the practice of using tipped employees to do the work of GU and expediter positions

without requiring that the time be recorded at those job codes.

## II.    Tipped and non-tipped occupations.

In order for AppleIllinois to take a tip credit against the minimum wage for the hours the servers, hosts, bartenders and carsides worked, the employee must be "engaged in an occupation in which gratuities have customarily and usually constituted and have been recognized as part of the remuneration for hire purposes."  820 Ill. Comp. Stat. § 105/4(c).  If an employee is employed in both tipped and non-tipped occupations, no tip credit can be taken for the employee's "hours of employment" in the non-tipped occupation.  29 C.F.R.§ 531.56.

Because the evidence shows that, with few exceptions, AppleIllinois' tipped employees were paid at the tip credit rate (except for time at meetings), the issue is whether AppleIllinois' tipped employees were engaged in tipped occupations for all of their working time.

What is the relevant distinction between tipped and untipped occupations?  A number of ways to draw the line have been suggested and are discussed below.  But under any reasonable construction of that distinction, the court concludes that plaintiffs have demonstrated that, as a regular practice, AppleIllinois employed its tipped workers in "dual jobs," that is, in both tipped and non-tipped occupations.

### A.    *AppleIllinois' separate tipped and untipped occupations*.

One way to make the distinction is to follow the line drawn by AppleIllinois itself.  The evidence here demonstrates that AppleIllinois designed distinct and specifically delineated occupations for its restaurant business.  In some of those defined occupations (servers, hosts,

bartenders and carsides), gratuities were "part of the remuneration for hire purpose" as described in the IMWL, and in others, workers were paid minimum wage or more. Persons employed in the occupations of GU and expediter, for example, were not engaged in an occupation in which gratuities were part of the remuneration, as evidenced by the fact that AppleIllinois did not take a tip credit for those employees' time. Nor is there any evidence that tips are "customarily" part of the remuneration for GU or expediter positions.

Context *is* important here. The AppleIllinois restaurants described in the evidence are not short-order diners where, as suggested in the dual jobs regulation, a "counterman" takes a turn as cook. The AppleIllinois restaurants are full service casual dining restaurants with defined positions and pay scales for each of the positions. At AppleIllinois, "kitchen professionals" are paid better than minimum wage, twice as much as servers. Each of the defined positions comes with a written list of duties described in the position descriptions. Those position descriptions are AppleIllinois policy because they were adopted from the franchisor. The "Best Demonstrated Practices" document (which was produced by AppleIllinois in discovery although AppleIllinois executives disclaimed awareness of it) reflects that the BOH positions and FOH positions are different occupations for purposes of taking the tip credit.

If the line between tipped and non-tipped occupations is drawn where AppleIllinois itself drew it, it is clear that AppleIllinois employed tipped workers in dual jobs because it is undisputed that AppleIllinois employed tipped workers to do the duties of GU and Expo workers when those workers were not scheduled.

The evidence shows, for example, that it was a standard practice, acknowledged by the AppleIllinois executives, that servers would do the expediter's work when an expediter was not

scheduled. That includes setting up, cleaning and stocking the expediting stations located in the back of the house, which, as Ms. Bennigen stated, can take 30 to 60 minutes of a five-hour shift. "Expediting" an order in an AppleIllinois restaurant is not just putting a piece of parsley on a finished plate. If a server is required to expedite his or her own orders, it can take as long as five minutes per table. (Decl. Daryl Scarborough ¶¶ 26, 42; Decl. Beth Sodt ¶ 48.)

AppleIllinois acknowledges its policy that "all Front of the House employees can act as the GU or Expo for slow shifts." (Defs.' Opp'n at 4.) AppleIllinois also states that under its policy, the employee should be clocked in under a job code that pays the minimum wage when working in a non-tipped position (*id.*), but the evidence of payment records submitted to this court does not reflect that was done. The payment records show very little (or no) time paid at minimum wage in contrast to the substantial amount of time the current employees describe in their declarations doing GU or Expo functions. AppleIllinois followed the "Best Demonstrated Practices" document as far as having FOH employees perform the functions of BOH employees, but did not follow the instruction to have them clock in at the BOH codes.

There is an obvious financial incentive to avoid scheduling minimum wage employees if tipped employees can be required to do the work at the tip credit rate. AppleIllinois was aware of that incentive. The 1999 corporate minutes reflect discussion of the savings that can be achieved based on the Chicago experience of using employees, including servers and hosts, to do the cleaning that would otherwise be done by a contracted service.

The evidence establishes that AppleIllinois created tipped and non-tipped occupations, and used tipped employees to do the duties of non-tipped employees at tip credit rates.

B.     *Qualitative distinctions in duties: related and unrelated duties.*

Alternatively, assuming *arguendo* that AppleIllinois is not held to respect the distinctions it drew between tipped and untipped occupations, it is possible to identify certain duties that clearly are not part of the occupation of a tipped employee.  As observed in the ruling on class certification, the dual jobs regulation includes "related duties" as a potential (but limited) part of a tipped occupation: it states that "related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips."  (*See* Mem. Op. & Order at 35 (citing 56 C.F.R. § 531.56(e)).)  The implication is that the tip credit may not be taken for time spent in duties unrelated to the tipped occupation.  *See, e.g., Dole v. Bishop*, 740 F. Supp. 1221, 1228 (S.D. Miss. 1990) (time spent cleaning bathrooms and preparing food must be paid at minimum wage because those tasks are not incidental to servers' tipped duties); *Barcellona v. Tiffany English Pub, Inc*. 597 F.2d 464, 467 n.3 (5th Cir. 1979) (affirming judgment granting waiters full minimum wages "for those hours worked in a nontipped capacity, such as laying tables, cleaning up, and other duties preparing the restaurant for business").

AppleIllinois' executives themselves recognize that some tasks are plainly outside a tipped occupation.  For example, both Smith, the president of AppleIllinois, and Cortner, its vice-president of human relations, stated that tipped employees should "never" mop floors or clean bathrooms.  Smith stated that tipped employees should not wipe down walls.  Since 2008, it has been AppleIllinois policy that tipped employees do not wash dishes, and, Long said, it has never been acceptable for servers to wash pots and pans.

Yet the declarations establish that many AppleIllinois' tipped employees were required to do those tasks either as part of "sidework" or as rotated cleaning duties.  In fact, it is striking how

often the current employees (in declarations that were submitted by AppleIllinois) describe their regular duties as including the very things that the executives state should *not* be done by tipped employees: cleaning bathrooms including toilets, sinks, mirrors and urinals; wiping down walls; polishing paneling with Pledge or lemon oil; mopping or scrubbing floors; and loading the dishwasher. In addition, they report doing other tasks that are so far removed from a tipped occupation that they cannot be reasonably regarded as "related" duties as that term is used in the dual jobs regulation, for example: washing windows; cleaning chandeliers; picking up trash in the parking lot; taking out garbage; restocking bathrooms; and dumping and refilling the "sani" bucket. Although practices were not identical at different restaurant locations, the evidence shows that many AppleIllinois' tipped employees were regularly required to perform tasks that cannot be considered "related" to their tipped occupation under any reasonable construction of that term.[14]

C.    *Temporal limitation: a substantial amount of time*

This court previously looked to the distinction between related and unrelated duties in the dual jobs regulation for purposes of the class certification ruling because AppleIllinois then urged that the temporal limitation on related duties (a "substantial amount of time") set out in the dual jobs

---

[14] Unlike the discrimination statutes considered in *Wal-Mart v. Dukes* and *Bolden v. Walsh Constr. Co.*, ___ F.3d ____, 2012 WL 3194593 (7th Cir. Aug. 8, 2012), liability under the wage and hour statutes does not depend on the employer's intent. *See* 29 U.S.C. § 206(a); 820 Ill. Comp. Stat. § 105/4(a)(1). Thus, whether the corporate executives intended to violate those statutes by requiring tipped employees to do unrelated tasks is not relevant. AppleIllinois itself submitted declarations from tipped employees from many if not all of the AppleIllinois restaurant locations describing the tasks they are required to do, which demonstrate that requiring tipped employees to do, for example, general cleaning, is a common practice in AppleIllinois restaurants, not the decision of one or two rogue managers.

regulation was impossible to apply on a class-wide basis.  (*See* Mem. Op. & Order at 35.)  Now, however, AppleIllinois argues that the "Court will enter uncharted territory" if it "embarks on defining what are 'related' and 'unrelated' duties."  (Defs.' Mem. at 7.)  AppleIllinois asserts that "there is substantial overlap of duties among occupations" in the restaurant industry (Defs.' Opp'n at 13), and urges the court not to interpret the regulations as holding that specific tasks are outside the tipped occupation if an employee performs them "even if for only a few seconds or minutes at a time" (*id.* at 1).  Of course, *de minimis non curat lex* (the law is not concerned with trifles), but "a few seconds or minutes" is not what this case is about.  The evidence presented in the declarations shows that the tipped employees were required to spend significant percentages of their shifts doing tasks that would otherwise be done by BOH workers at the minimum wage rate.

But more importantly, AppleIllinois' response to plaintiffs' motion acknowledges that there is a *quantitative* as well as a *qualitative* element to the distinction between the duties of the tipped and untipped occupations in the restaurant industry.  AppleIllinois states that "it has never been AppleIllinois' position that an employee working as a dishwasher or expediter for a significant amount of time, *e.g.*, for an hour or more, be paid the tip credit for that time."  (Defs.' Opp'n at 17.) It states that "spending *some* time washing dishes or glasses is perfectly consistent with tipped employment, as is spending *up to 20% of working time* on general preparation work or maintenance."  (*Id.* at 13 (quotation omitted, emphasis in original).)

Recognizing a temporal limitation on related but not tip-producing duties is consistent with the holding of the Eighth Circuit in *Fast*.  "By using the terms 'part of [the] time' and 'occasionally,' the regulation clearly places a temporal limit on the amount of related duties an employee can perform and still be considered to be engaged in the tip-producing occupation."  *Fast*, 638 F.3d at

879. The court there concluded that the DOL reasonably interpreted the regulation to mean that employees who spend "substantial time" – more than 20% – performing related but non-tipped duties should be paid at the full minimum wage for that time. *Id*. at 880. The DOL's interpretation, the court held, is entitled to deference, and, in turn, the Eighth Circuit's opinion is entitled to respectful consideration by this court. *Glaser*, 14 F.3d at 1216.

Enforcing a temporal limitation on related but non-tipped duties is not radical or even innovative. The DOL Handbook section setting out temporal limitation dates from 1988, 24 years ago.

Accepting AppleIllinois' own invocation of the temporal limitation, and respecting the *Fast* opinion's conclusion that the DOL's interpretation of a temporal limitation is entitled to deference, makes it unnecessary to decide, for example, whether silverware rolling is "related" or "unrelated" to the occupation of server. Even if, *arguendo*, silverware rolling is considered "related," it is clearly not tip-producing.[15] Here, the evidence on the motion – particularly the declarations of the current employees and the descriptions of the sidework required of tipped employees – demonstrates that

---

[15] Although it is not necessary to decide for purposes of this motion, the evidence supports the conclusion that silverware rolling is a not a "related" duty. Silverware rolling consists of rolling a knife and fork into a napkin. (Long dep. at 192.) In the AppleIllinois restaurants, it is done in the back of the house in the expo area of the kitchen next to the expo line. (*Id*. at 191-92). It is not an "occasional" or "incidental" part of a server's duties nor is it a service for a particular customer. Rather, tipped employees are required be in the kitchen rolling silverware as part of their sidework for periods as long as 30 minutes, as reflected in the declarations.

*Turner v. Millennium Park Joint Venture, LLC*, 767 F. Supp. 2d 951 (N.D. Ill. 2011), cited by AppleIllinois, does not hold or even suggest a contrary result. That case involved participation in a tip pool (discussed further below), not the dual jobs regulation. The court held that silverware rollers were permitted to participate in the tip pool in that particular restaurant because the other tipped employees voluntarily gave them a share of the tips, not because silverware rolling is an occupation in which tips are customarily and regularly received. *Id*. at 955.

AppleIllinois required many tipped employees to spend "a substantial amount of time (in excess of 20 percent)" performing sidework duties that were not tip producing.

The employer is required to comply with the minimum wage requirements of the IMWL and the FLSA. AppleIllinois was required to comply with the regulation, including the temporal limitation on tipped employees performing nontip-producing duties, even "related" duties, and with the DOL's interpretation of that regulation. AppleIllinois' own "Best Demonstrated Practices" call for having workers clock in and out as they move between FOH and BOH duties. AppleIllinois' POS system had the capacity to do that; restaurant managers have the ability to input codes for each of the positions and to have employees clock in and out for work at different pay rates. But the evidence demonstrates that, with few exceptions, tipped employees' time doing BOH duties was not recorded separately and not coded at minimum wage rates. The dual jobs regulation, as interpreted by the DOL, permits "related duties" that are not tip-producing to be done by tipped employees, but to a limited extent not to exceed 20% of the worker's shift. The evidence here shows that AppleIllinois did not respect that limitation.

### III.     Amending the definition of the plaintiff class.

As discussed above, the class certification order defined the class as consisting of persons employed by Defendant AppleIllinois, LLC from October 6, 2003 to the conclusion of this action, who worked as tipped employees earning a sub-minimum, tip credit wage rate, and who performed duties unrelated to their tipped occupation for which they were not paid at the minimum wage rate. (Mem. Op. & Order at 47.) That was based on AppleIllinois' argument that the experience of its tipped employees was too varied to be treated as a class for purposes of enforcing the temporal

limitation in the dual jobs regulation.

AppleIllinois now invokes the temporal limitation as a reasonable part of the sharing of tasks across occupations in the restaurant industry. Further, the Eighth Circuit's decision in the *Fast* case accords deference to the DOL's interpretation of the dual jobs regulation, which includes a temporal limitation on nontip-producing tasks as a distinction between tipped and non-tipped occupations. Finally, the evidence on the motion demonstrates that AppleIllinois' policy of sidework, coupled with its practice of using tipped employees instead of scheduling GU workers and expediters, meant that in practice many tipped employees were required to spend more than 20% of their shift doing tasks that were not tip-producing.[16] Although the specific tasks varied somewhat, the employees are, in fact, able to estimate the amount of time they spend on nontip-producing tasks, and the cumulative total of time in many of the declarations exceeds 20% of their shifts. Deciding who is a member of a class that includes a temporal limitation on nontip-producing duties, and determining damages under the *Mt. Clemens* standard as applied in the *Fast* case, as discussed below, will be easier than it appeared at the time of the class certification.

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). It is now apparent, based on the law and evidence, that defining the class in terms of "related and unrelated" tasks takes into consideration only part of the

---

[16] This conclusion is further supported by many of the employee declarations AppleIllinois previously submitted in opposition to plaintiffs' class certification motion that were not resubmitted with the present motion. *See, e.g.,* Decl. Rita Woit ¶¶ 3, 4, 50-66 (estimating that during her typical 240 minute host shifts in Mundelein she spends 58-73 minutes on sidework; Decl. Crystal Holliman ¶¶ 3, 4, 24-41 (estimating that during her 300-360 minute server shifts in Ford City she spends as much as 67 minutes on sidework); Decl. Amy McDonald ¶¶ 3, 4, 28-38, 41 (estimating that during her 240-300 minute server shifts in Mokena she spends as much as 180 minutes on sidework).

appropriate distinction between tipped and untipped occupations. The AppleIllinois employees who worked "dual jobs" as that term is construed under the regulation included not only those who performed tasks unrelated to their tipped occupation but also those who performed nontip-producing tasks "a substantial amount of the time (in excess of 20%)" of their shift. The class definition is hereby amended as follows:

> Persons employed by Defendant AppleIllinois, LLC, from October 6, 2003, to the conclusion of this action, who worked as tipped employees earning a sub-minimum, tip credit wage rate, and who: a) performed duties unrelated to their tipped occupation for which they were not paid at the minimum wage rate; and/or b) performed nontip-producing duties a substantial amount of the time (in excess of 20%) of their shift and were not paid at the minimum wage for that time.

## IV. Conclusion: AppleIllinois' tipped employees worked in dual jobs for which they were paid at tip credit rates.

The evidence presented on plaintiffs' motion, considered in the light most favorable to AppleIllinois, demonstrates that it was the practice of AppleIllinois for tipped employees to work in "dual jobs," as described in the DOL regulation. The evidence shows that many tipped employees were required to perform tasks that are admittedly unrelated to their tipped occupations, such as general cleaning, and that, as a matter of policy, all tipped employees were required to do other sidework such as silverware rolling, which, whether construed as related or unrelated to the tipped occupation, was not tip-producing. The evidence before the court also establishes that for many of the tipped employees, the total time spent on such nontip-producing sidework often exceeded 20% of the employee's shift. The evidence also shows that, with few exceptions, AppleIllinois did not separately record time spent by tipped employees doing work in non-tipped occupations, and did not pay tipped employees at least the minimum wage for that time.

46

Contrary to AppleIllinois' fears, enforcing the dual jobs regulation does not prohibit "a team-oriented approach to serving customers." (Defs.' Opp'n at 1.) It simply requires that when tipped employees are also required to perform the work of minimum wage workers, they get paid the minimum wage. What the law prohibits is what is evidenced here: AppleIllinois using servers, hosts, carsides, and bartenders to do non-tipped duties in lieu of minimum wage workers, and paying the tipped employees at the tip credit rate for all of their time, no matter what they were doing and how long they did it.

Accordingly, the plaintiff class, defined as set out above, is entitled to judgment as a matter of law on their claim that AppleIllinois violated the IMWL by failing to pay tipped workers at the rate required by the IMWL for all of the time they worked.

## V. AppleIllinois' motion for summary judgment

After the close of briefing on plaintiffs' motion, AppleIllinois also moved for summary judgment on the dual jobs claims. AppleIllinois makes an initial cursory argument that the tasks its tipped employees do are like the tasks described in the dual jobs regulation (such as setting tables and making coffee) and therefore plaintiffs cannot trigger a right under the dual jobs regulation to claim any time is entitled to minimum wage. (Defs.' Mem. at 5-6.)[17] For the reasons described

_____

[17] For example, AppleIllinois asserts that rolling silverware is "comparable to setting tables," which is mentioned in the dual jobs regulation (Defs.' Mem. at 5), but the comparison is not apt. Unlike setting tables which is done in the front of the house for customers, the evidence here shows that silverware rolling is a back-of-the-house activity that is done in the kitchen area out of the presence of customers for as long as 30 minutes at a time.

A similar argument – that anything a server or bartender does is incidental to the tipped occupation and can be paid at the tip credit rate – was rejected in *Fast*, 638 F.3d at 875, 881.

above, that argument is contrary to the evidence in this case, as well as the regulation itself and the case law interpreting the regulation.

The main thrust of AppleIllinois' motion, however, is based on a line of cases dealing with a different issue: which employees can be included in a valid tip pool. From those cases, AppleIllinois argues that employees who have "significant customer interaction" are in a tipped occupation. (*Id*. at 8-9.) Since none of the plaintiffs suggested they did not have significant customer interaction, AppleIllinois concludes that plaintiffs are in a tipped occupation, and can be paid at the tip credit rate for all of their working time no matter what they do and for how long they do it. (*Id*. at 13.)

AppleIllinois argues that there is "an inexplicable dichotomy within the case law" which would be "exacerbated" by analyzing the dual jobs regulation by looking at whether duties are "related" while analyzing the participation of persons in a tip pool by level of customer interaction. (*Id*. at 11.) But the dichotomy is not at all inexplicable: Although they employ a common concept that stems from 29 U.S.C. § 203(t) – an employee who "customarily and regularly" receives tips – the tip pool regulation and the dual jobs regulation regulate two different practices and answer two different questions.

Section 203(m) of the FLSA allows employers to take the tip credit in paying a "tipped employee." 29 U.S.C. § 203(m). That section also states that "this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." *Id.* Those two provisions of Section 203(m) led to different regulations: the dual jobs regulation quoted above, and the tip pool regulation (29 C.F.R. § 531.54), which says that "valid mandatory tip pools . . . can only include those employees who customarily and regularly receive tips." The tip pool

48

regulation answers the question: who may be included in a valid tip pool? The dual jobs regulation answers the question: for what hours of employment can an employer take the tip credit?

For that reason, it is simply not correct to extrapolate, as AppleIllinois does, from the decisions about who may participate in a valid tip pool to a conclusion that all work done by those employees – no matter what the work and no matter for how long – may be paid at the tip credit rate. To do so would be to ignore both the actual text of the dual jobs regulation and the DOL's own interpretation of that regulation as reflected in the Handbook.[18] The fact that a host may have sufficient interaction with customers to be eligible for participation in a tip pool (*see Kilgore v. Outback Steakhouse of Florida*, 160 F.3d 294, 300-01 (6th Cir. 1998)), does not mean that an employer can require a host to work as a cook or cleaner for a substantial amount of his shift and pay him at the tip credit rate for that time.

The cases dealing with the dual job regulation properly focus on not only whether the employee's nominal occupation is one in which he has contact with customers, but what the employer actually has the employee doing during his work time, because an employer may take a tip credit "only for hours worked by [an] employee in an occupation in which the employee qualifies as a 'tipped employee.'" 29 C.F.R. § 531.59(b).

---

[18] Moreover, the tip pool regulation is further complicated by the fact that it allows voluntary tip pools to include employees who do *not* customarily and regularly receive tips from customers, as illustrated by *Turner v. Millennium Park Joint Venture, LLC*, 767 F. Supp. 2d 951 (N.D. Ill. 2011), a case upon which AppleIllinois relies. The court there permitted silverware rollers to participate in a valid tip pool because the tipped employees voluntarily agreed to include them. "That [tip pooling] regulation would not countenance a situation where, in sharp contrast to what took place at Park Grill, an employer forces its employees receiving tips directly from customers to contribute to a tip pool." *Id*. at 954.

49

AppleIllinois' motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is granted as to liability on the plaintiffs' dual jobs claim under the IMWL and as to the named plaintiffs' dual jobs claim under the FLSA, and AppleIllinois' motion for summary judgment on the same claims is denied. Plaintiffs may establish damages using the *Mt. Clemens* burden-shifting framework as described in *Fast*, 638 F.3d at 882. A status hearing will be set to schedule further proceedings.

IT IS SO ORDERED.

_____
Geraldine Soat Brown
United States Magistrate Judge

August 27, 2012